[No. S103343. Aug. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN PAUL REYNOSO, Defendant and Appellant.

[No. S103340. Aug. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JULIAN JESUS REYNOSO, Defendant and Appellant.

## Counsel

Alisa M. Weisman, under appointment by the Supreme Court, for Defendant and Appellant John Paul Reynoso.

Kim Malcheski, under appointment by the Supreme Court, for Defendant and Appellant Julian Jesus Reynoso.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Jo Graves, Assistant Attorney General, Stan Cross, Patrick J. Whalen, John G. McLean and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BAXTER, J.**—Defendants John Paul Reynoso and Julian Jesus Reynoso were jointly tried and convicted by a jury of the first degree murder of Mario Martinez and related offenses. The trial court rejected a defense motion challenging the prosecutor's peremptory excusal of two Hispanic jurors as unconstitutionally based on group bias. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) [U.S. Const.]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) [Cal. Const.].) The Court of Appeal disagreed respecting the peremptory excusal of one of the two jurors, and on that basis reversed the judgments. We granted the People's petitions for review and consolidated both matters for purposes of oral argument and opinion.

In *Wheeler* we held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias" violates a defendant's right under the California Constitution to a trial by jury drawn from a representative cross-section of the community. (*Wheeler, supra,* 22 Cal.3d at

pp. 276–277.) We recognized there is a general presumption "that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground," but went on to explain that the presumption is rebuttable, formulating a three-step test for establishing a claim of *Wheeler* error. (*Id.* at p. 278.) In the final analysis, the party raising the claim bears the burden of showing *"from all the circumstances of the case* . . . a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Id.* at p. 280, italics added.) We further recognized that we must "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Id.* at p. 282.) The high court has agreed, explaining that "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility," and for that reason "a reviewing court ordinarily should give those findings great deference." (*Batson, supra,* 476 U.S. at p. 98, fn. 21.)

We granted review to consider whether the Court of Appeal misplaced reliance on this court's recent decision in *People v. Silva* (2001) 25 Cal.4th 345 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*) in reversing the trial court's ruling that no *Wheeler* error occurred here. We conclude that the holding of *Silva* is inapposite on these facts. Having considered all the circumstances of this case (*Wheeler, supra,* 22 Cal.3d at p. 280), we further conclude that the trial court's determination that no *Wheeler* error occurred should be given the customary "great deference" normally afforded such rulings. (*Batson, supra,* 476 U.S. at p. 98, fn. 21.) Accordingly, we shall reverse the judgments of the Court of Appeal.

## I. FACTS AND PROCEDURAL HISTORY

Defendant John Reynoso and his brother Julian were at a residence with several others, including the murder victim, Mario Martinez. John Reynoso and Martinez got into an argument, which culminated in Reynoso fatally shooting Martinez in the chest at point-blank range with a shotgun. Reynoso admitted shooting Martinez, but claimed he did so because he was in fear for his brother Julian's life. Julian's defense was that he did not aid or abet his brother and had no prior knowledge that John was going to shoot Martinez. Julian himself was armed with a handgun and threatened one of those present with it as the two brothers fled. Both defendants were convicted of first degree murder. John Reynoso was found to have used a firearm and inflicted great bodily injury during the commission of the murder within the meaning of Penal Code section 12022.53, subdivision (d). Julian Reynoso was also convicted of assault with a firearm, knowingly and maliciously dissuading a witness, and being an accessory after the fact.

Each defendant separately appealed his judgment of guilt. Defendant Julian Reynoso raised issues pertaining to his murder conviction as well as his separate convictions of related offenses. He thereafter filed supplemental briefing seeking to join in several claims in brother John's appeal, including the *Batson/Wheeler* claim. The Court of Appeal took judicial notice of John's appeal and allowed Julian to join in the claim, but did not consolidate the matters. The court issued separate but nearly identical opinions, published in John Reynoso's case, unpublished in Julian Reynoso's case, utilizing the identical analysis and discussion to reverse each judgment for *Batson/Wheeler* error.[1]

The facts relevant to the *Batson/Wheeler* claim are as follows. Jury selection lasted less than one day. At the start of voir dire, the trial court excused a total of 53 prospective jurors on the basis of claims of hardship, without objection from the defense. More than one-quarter of those excused for claimed hardship (at least 14 prospective jurors, and perhaps as many as 17) were of Hispanic ancestry. The People exercised a total of four peremptory challenges, the last two of which were to Hispanic Prospective Jurors Mary L. and Elizabeth G. Defendants are Hispanic. So, too, was the murder victim. The final jury sworn to hear defendants' case contained no Hispanic jurors.

The trial court conducted the voir dire and initially asked each prospective juror to answer nine questions posted on a board in the courtroom, which asked for his or her name, general address, occupation and length of occupation, spouse's occupation and length of occupation, marital status, prior jury service, if any (type of case, how long ago, whether a verdict was reached), past involvement in a criminal case (as a charged suspect, victim, or witness to a crime), legal or medical training, if any, past involvement in law enforcement, if applicable, and whether they had any close friends or relatives in law enforcement.

Mary L. gave the following response to the court's general inquiry: "My name's [Mary L.]. I live in Earlimart, California. I've lived there most of my life. I'm a case manager for at-risk youth. My husband is a foreman for farm labor. I've never been selected for jury. I've never been involved in a criminal charge or victim. I have no legal or medical training. Never been involved in law enforcement. And I do have relatives that are in law enforcement."

---

[1] Since these codefendants were jointly tried and convicted, and all of the facts and arguments relevant to the *Batson/Wheeler* issue that led to reversal were one and the same in the trial court, the Court of Appeal, and now in this court, we consolidated these matters for purposes of oral argument and opinion.

Mary L. was thereafter excused as a result of the prosecutor's exercise of his third peremptory challenge, after he had passed and accepted the jury four times while she was seated in the jury box.

Elizabeth G. gave the following response to the court's general inquiry: "My name is [Elizabeth G.]. I just moved to Porterville for four months. My occupation I'm a customer service rep. I've been there for eight and a half years. My spouse, he's a construction supervisor. And he's been that for over 18 years. I've never served on a jury before. I've never been involved in any criminal [sic] or been a victim. I don't have any legal or medical training. Never been involved in any law enforcement. As far as a friend, I have a friend who's an officer in Porterville. As far as the relative, he's a brother who is a correctional officer."

Elizabeth G. was thereafter excused as a result of the prosecutor's exercise of his fourth and final peremptory challenge, after he had passed and accepted the jury 14 times while she was seated in the jury box.

After jury selection was completed but before the jury and alternates were sworn, defendant Julian Reynoso made a *Batson/Wheeler* motion, arguing that the peremptory challenges to Mary L. and Elizabeth G. were made solely out of group bias, i.e., on racial grounds, in violation of his constitutional rights, rather than for proper reasons specific to the challenged prospective jurors. (*Batson, supra,* 476 U.S. at pp. 84–89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.)

Counsel articulated the basis for his motion as follows: "The [prosecutor] kept passing and passing and passing and saying that they were happy with the jury, happy with the jury. [¶] Of the only juror they excused initially was the one gentleman who knew me from [a local tennis club], and then after that the only two other jurors that were dismissed [by the prosecutor] were Hispanics, [Elizabeth G.] and [Mary L.] [¶] I would take note of the fact that the jury as it's constituted now has twelve Whites as the twelve jurors and three white alternates. I think it was a deliberate attempt by the prosecution to eliminate the two Hispanics that made it to the jury panel [sic: box] from the jury panel. The two defendants in this case are both Hispanic. I believe that's a violation of *Wheeler*, your Honor." Codefendant John Reynoso joined in the motion.

The trial court indicated that "because the People did only exercise . . . four [peremptory] challenges and two of those were Hispanic, I'm going to ask that the People give their reasons why they excused those two." The prosecutor sought clarification as to whether the court was ruling that a prima

facie case (of systematic exclusion for group bias) had been shown. The court replied, "Yes." The prosecutor proceeded to give his reasons for excusing Mary L. and Elizabeth G.

The prosecutor's reasons for exercising his third peremptory challenge to excuse Prospective Juror Mary L. were these: "Your Honor, the People dismissed [Mary L.] based upon her being a counselor for at-risk youth. The People feel that [Mary L.] would have an undue sympathy for both defendants in this case because they are young and definitely if not at risk, past risk. [¶] The People feel that she would associate with the people she works with and she would probably would have pity on them."

The prosecutor's reasons for exercising his fourth peremptory challenge to excuse Prospective Juror Elizabeth G. were as follows: "In terms of [Elizabeth G.], the People dismissed [Elizabeth G.] because she was [a] customer service representative. In terms of that, we felt that she did not have enough educational experience. It seemed like she was not paying attention to the proceedings and the People felt that she was not involved in the process. The People felt she would not be a good juror."

The trial court responded, "And I accept those reasons as being not based upon race or ethnicity. And I don't find that there has been a violation of *Wheeler* and that the—there was not a systematic exclusion of a recognized ethnic group, i.e., Hispanics in this case. So the motion is denied."

Counsel for defendant Julian Reynoso asked if he could make a couple of points for the record, and the court permitted him to do so. The following colloquy then took place:

"[Counsel for Julian]: And a couple points for the record is that counsel for the People passed on [Elizabeth G.] about seven or eight times. Then when I think he sensed that the defense was getting ready to pass, then it [*sic*: he] excused [Elizabeth G.] There's nothing about what [Elizabeth G.] said in terms of her background that would make her be sympathetic to the defendants in this case. When she said she was a customer service rep. Her husband is a construction supervisor. [¶] She's got friends in the Porterville [Police Department], her brother or brother-in-law works for the California Department of Corrections. There was nothing in her responses or her demeanor that would justify just excusing her other than it being a race-based exclusion is our position.

"The Court: And I believe that there was another Hispanic that was excused not by the People, but by the defense, and that was [Carolyn G.].

"[Counsel for Julian]: That was a legitimate reason. I didn't excuse her.

"The Court: I'm not saying it wasn't legitimate. You just brought up—I'm not arguing with you, but I want the record to be clear, you argued that even a person who the People should want to have on, namely law enforcement background, may still kick off [*sic:* be kicked off] because of being Hispanic. I'm just pointing out that [Carolyn G.] was another person that is [of] Hispanic background but they did not kick [her] off and I believe her background was that she had been the one who had been kidnapped.

"[Counsel for Julian]: Right. I would say she would want to be kept on by the People because she's been a victim of a violent crime at gunpoint.

"The Court: But your argument was that so should the other person[2] because they had law enforcement background.

"[Counsel for Julian]: I didn't say she was law enforcement background.

"The Court: I thought you said—

"[Counsel for Julian]: I was looking over my notes in terms of what she[3] said in answer to the nine questions that are up on the little poster. She responded that she has friends in the Porterville [Police Department].

"The Court: Right. Law enforcement people.

"[Counsel for Julian]: And a brother who works for California Department of Corrections. So I'm just saying that based on those responses, there's no legitimate reason to exclude her based on those responses other than the fact that she has her—she's Hispanic. I'm trying to make that for the record. [¶] [The prosecutor] argued that [Mary L.] would be sympathetic because she works with at risk youth. That's his reason for excusing her. But for the record also the reason [Carolyn G.] was excused, as I understand it from [counsel for John Reynoso,] is because she was a victim of violent crime where guns were involved. That's what we have here.

"The Court: Okay. Thank you.

"[The Prosecutor]: I'd like the record to reflect that defense counsel also had a challenge to [Mrs. T.], [who] seemed and looked Hispanic to me and I think they exercised or kicked off her as well.

"The Court: All right. We'll see you tomorrow morning at 9:45."

---

[2] In context, it is clear that "the other person" the court was now referring to was Elizabeth G., whom the People had excused with their final peremptory challenge.

[3] Again, in context, it is clear counsel is here referring to Elizabeth G.

The trial court made no further comment on its denial of the *Batson/Wheeler* motion.

The Court of Appeal concluded that this court's decision in *Silva, supra,* 25 Cal.4th 345, required reversal of the judgments. The court focused solely on the prosecutor's peremptory challenge of Elizabeth G., and, more specifically, on the second race-neutral reason he gave for excusing her—that "[she] was not paying attention and was not involved in the process." The court believed that the fact that the trial court "did not respond to or even acknowledge defendant's [statement] that there was nothing in [Elizabeth G.'s] demeanor that would justify excusing her," even though defendant's statement "demonstrated his disagreement with the prosecutor's assessment" of that prospective juror, was a significant transgression of this court's holding in *Silva.*

The Court of Appeal acknowledged that "[t]he reasons given by the prosecutor in *People v. Silva, supra,* 25 Cal.4th 345, were contradicted by the record and were thus implausible and unsupported by the record," but nevertheless found *Silva* apposite and controlling on these facts. The court reasoned further that "[w]hile the record does not contradict the reasons given [by the prosecutor] here, neither does the record on appeal support them. The record does not engender confidence in a finding that the trial court engaged in a sincere and reasoned attempt to evaluate the prosecutor's justification for challenging [Elizabeth G.] First, as previously discussed, the initial reason given by the prosecutor ([Elizabeth G.] was a customer service representative with a lack of educational experience) was not supported by the record and lacked any content related to the case being tried. Second, the demeanor reason given by the prosecutor, which is not reflected within the cold record on appeal, was disputed by the defense yet not clarified in any way by the court. Finally, in rejecting defendant's argument, rather than focusing on the question of validity of the People's justifications, the trial court attempted to buttress its finding by analyzing a Hispanic juror not challenged by the People, but excused by the defense. . . . [¶] Trial courts should not relieve prosecutors of their burden during a *Wheeler* motion by readily accepting vague explanations. On this record, we are unable to conclude that the trial court satisfied its obligations to evaluate the prosecutor's explanation. (*People v. Silva, supra,* 25 Cal.4th at p. 385.)"

We granted the Attorney General's petition for review.

## II. DISCUSSION

### A. *Wheeler*

In *Wheeler* we held that "the use of peremptory challenges to remove prospective jurors on the *sole* ground of group bias" violates a defendant's

right under the California Constitution to a trial by jury drawn from a representative cross-section of the community. (*Wheeler, supra,* 22 Cal.3d at p. 276, italics added.) Discrimination in the exercise of peremptory challenges likewise violates the defendant's equal protection rights under the federal Constitution. (*Batson, supra,* 476 U.S. at pp. 84–89.) *Wheeler* recognized there is a general presumption "that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground," but went on to explain that the presumption is rebuttable. (*Wheeler, supra,* 22 Cal.3d at p. 278.) We adopted the following test in *Wheeler* for determining when the exercise of peremptory challenges violates a defendant's constitutional jury trial right: "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Wheeler, supra,* 22 Cal.3d at p. 280, fn. omitted; see also *People v. Johnson* (2003) 30 Cal.4th 1302, 1309 [1 Cal.Rptr.3d 1, 71 P.3d 270].)

We then explained how a defendant would go about making the necessary showing to perfect a *Wheeler* motion: "[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Wheeler, supra,* 22 Cal.3d at pp. 280–281, fn. omitted; *People v. Johnson, supra,* 30 Cal.4th at p. 1309.)

Lastly, *Wheeler* discusses how a trial court should rule on the motion:

"Upon presentation of this and similar evidence—in the absence, of course, of the jury—the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone.

We recognize that such a ruling 'requires trial judges to make difficult and often close judgments. They are in a good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' [Citation.] They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay.

"If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly ·offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.

"If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted." (*Wheeler, supra,* 22 Cal.3d at pp. 281–282, fn. omitted; *People v. Johnson, supra,* 30 Cal.4th at pp. 1309–1310.)

### B. *Batson*

The high court has devised a similar test for determining when the discriminatory exercise of peremptory challenges violates the equal protection clause of the federal Constitution: "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. *Hernandez v. New York* 500 U.S. 352, 358–359 [114 L.Ed.2d 395, 111 S.Ct. 1859] (1991) (plurality opinion); *id.,* at 375 (O'Connor, J., concurring in judgment); *Batson, supra,* at 96–98.)" (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769] (*Purkett*).)

The high court in *Purkett* emphasized that "The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' *Hernandez*, 500 U.S., at 360 (plurality opinion); *id.*, at 374 (O'Connor, J., concurring in judgment)." (*Purkett, supra,* 514 U.S. at pp. 767–768.)

The court went on to explain that the intermediate appellate court in that case had "erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, *i.e.*, a 'plausible' basis for believing that 'the person's ability to perform his or her duties as a juror' will be affected. [Citation.] It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Batson, supra,* at 98; *Hernandez, supra,* at 359 (plurality opinion). At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. Cf. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 [125 L.Ed.2d 407, 113 S.Ct. 2742] (1993).)" (*Purkett, supra,* 514 U.S. at p. 768.)

The high court in *Purkett* then pointed to language in *Batson* that may have been misconstrued: "The Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike 'must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges,' *Batson, supra,* at 98, n. 20 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 [67 L.Ed.2d 207, 101 S.Ct. 1089] (1981)), and that the reason must be 'related to the particular case to be tried,' 476 U.S., at 98. [Citation.] This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. See *Hernandez, supra,* at 359; cf. *Burdine, supra,* at 255 ('The explanation provided must be legally sufficient to justify a judgment for the defendant')." (*Purkett, supra,* 514 U.S. at pp. 768–769.)

Thus, the prosecutor's reason in *Purkett* for peremptorily excusing the prospective juror in question—because he had long, unkempt hair, a mustache, and a beard—was deemed by the high court to be an entirely valid, race-neutral reason that satisfied the prosecutor's burden under step two of articulating a *nondiscriminatory* reason for the peremptory challenge under scrutiny. The intermediate appellate court in *Purkett* had erred because it "did not conclude or even attempt to conclude that the state court's finding of no racial motive was not fairly supported by the record. For its whole focus was upon the *reasonableness* of the asserted nonracial motive (which it thought required by step two) rather than the *geniuneness* of the motive. It gave no proper basis for overturning the state court's finding of no racial motive, a finding which turned primarily on an assessment of credibility, see *Batson*, 476 U.S., at 98, n. 21." (*Purkett, supra,* 514 U.S. at p. 769.)

## C. *Peremptory Challenges*

It is well settled that "[p]eremptory challenges based on counsel's personal observations are not improper." (*People v. Perez* (1994) 29 Cal.App.4th 1313, 1330, fn. 8 [35 Cal.Rptr.2d 103] (*Perez*).) In *Wheeler* itself we observed, "Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust of a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries 353)—upon entering the box the juror may have smiled at the defendant, for instance, or glared at him." (*Wheeler, supra,* 22 Cal.3d at p. 275.) In *People v. Fuentes* (1991) 54 Cal.3d 707 [286 Cal.Rptr. 792, 818 P.2d 75] (*Fuentes*), we explained that "nothing in *Wheeler* disallows reliance on the prospective jurors' body language or manner of answering questions as a basis for rebutting a prima facie case" of exclusion for group bias. (*Id.* at p. 715.) And in *People v. Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047] (*Johnson*), we observed, "Nowhere does *Wheeler* or *Batson* say that trivial reasons are invalid. What is required are reasonably specific and neutral explanations that are related to the particular case being tried." (*Id.* at p. 1218.)

In *Perez,* the prosecutor noted she had personally observed a venireperson (Torres) "laughing at an inappropriate point during voir dire." (*Perez, supra,* 29 Cal.App.4th at p. 1330.) The *Perez* court explained, "Obviously, we cannot, on the cold record, verify the prosecutor's . . . stated reason for challenging Torres. This is, of course, one reason why appellate courts in this

area of law generally give great deference to the trial court, which saw and heard the entire voir dire proceedings." (*Ibid.*, fn. omitted.)[4]

In *Fuentes, supra,* 54 Cal.3d 707, we observed, "This court and the high court have professed confidence in trial judges' ability to determine the sufficiency of the prosecutor's explanations [for exercising peremptory challenges]. In *Wheeler,* we said that we will 'rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' (*Wheeler, supra,* 22 Cal.3d at p. 282.) Similarly, the high court stated in *Batson* v. *Kentucky, supra,* that 'the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility,' and for that reason 'a reviewing court ordinarily should give those findings great deference.' (476 U.S. at p. 98, fn. 21.)" (*Fuentes, supra,* 54 Cal.3d at p. 714.)

Finally, in *Johnson, supra,* 47 Cal.3d 1194, we explained, "Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.

"It is also common knowledge among trial lawyers that the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge and the number of challenges remaining with the

---

[4] "Typically, an appellate court has only a cold transcript, exhibits, and papers from the trial court's file to go on. Even when a videotape is available we cannot experience what the trial judge experienced—the nuances, the inflections, the body language which traditionally form part of the basis on which credibility is evaluated by triers of fact. Despite technology, credibility determinations require a personal presence that a cold transcript cannot convey." (*Abbott* v. *Mandiola* (1999) 70 Cal.App.4th 676, 682–683 [82 Cal.Rptr.2d 808] [motion for sanctions should be heard by judge who observed conduct of party against whom sanctions are sought].)

other side. Near the end of the voir dire process a lawyer will naturally be more cautious about 'spending' his increasingly precious peremptory challenges. Thus at the beginning of voir dire the lawyer may exercise his challenges freely against a person who has had a minor adverse police contact and later be more hesitant with his challenges on that ground for fear that if he exhausts them too soon, he may be forced to go to trial with a juror who exhibits an even stronger bias. Moreover, as the number of challenges decreases, a lawyer necessarily evaluates whether the prospective jurors remaining in the courtroom appear to be better or worse than those who are seated. If they appear better, he may elect to excuse a previously passed juror hoping to draw an even better juror from the remaining panel.

"It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar . . . . It is therefore with good reason that we and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose." (*Johnson, supra,* 47 Cal.3d at pp. 1220–1221.)

*Johnson* reaffirmed that when ruling on a *Wheeler* motion, the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' (*People* v. *Hall* (1983) 35 Cal.3d 161, 167–168 [197 Cal.Rptr. 71, 672 P.2d 854].)" (*Johnson, supra,* 47 Cal.3d at p. 1216.) ■ But in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom.

One might have concluded otherwise when reading this court's opinion in *People v. Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719] (*Trevino*), disapproved in *Johnson, supra,* 47 Cal.3d at pages 1219–1221. "Despite its professed confidence in the ability of trial judges to distinguish a true case of group discrimination, the majority in *Trevino* specifically disallowed reliance on body language and the prospective juror's mode of answering questions in rebutting a prima facie case. *Wheeler* had given no indication that such subjective reasons were unacceptable . . . . In ruling out

subjective reasons, the majority in *Trevino* . . . seem[ed] unwilling to trust the trial courts to conscientiously rule on the adequacy of the proffered explanations." (*Johnson, supra,* 47 Cal.3d at p. 1219.)

*Johnson* further faulted the majority in *Trevino* for unreasonably expecting trial judges to make "detailed comparisons mid-trial" of a prosecutor's "stated reasons for challenged excusals with similar characteristics of nonmembers of the group who were not challenged by the prosecutor." (*Johnson, supra,* 47 Cal.3d at p. 1220.) Finding that "*Trevino* extended *Wheeler* beyond its logical limits" (*id.* at p. 1219, fn. omitted), we concluded in *Johnson*: "Under the standard of giving great deference to the trial court's determination, we affirm the ruling in this case. The dissent, in our view, unjustly faults the trial court for not making a sincere and reasoned determination regarding the genuineness of the prosecutor's reasons. *There is no indication in the record that the court did not do so.* The dissent seems to believe that inquiry by the court is required to demonstrate compliance with its obligation under *Wheeler.* We do not read *Wheeler* or [*People* v. *Hall, supra,* 35 Cal.3d 161] as establishing such a requirement." (*Johnson, supra,* 47 Cal.3d at p. 1222, italics added.)

The Court of Appeal in this case acknowledged that the prosecutor's demeanor-based reasons for excusing Prospective Juror Elizabeth G.—that she was not paying attention to the proceedings and was not involved in the voir dire process—were not too general or too vague and could validly support the peremptory excusal of Elizabeth G. if the reasons were shown to be sincere and genuine. The court further acknowledged that "a somewhat inattentive prospective juror would be an appropriate concern, especially in a [murder] case of this magnitude. These particular reasons, if supported by the record, would be valid. *The critical question becomes whether the record supports this reasoning.*" (Italics added.)

The Court of Appeal, however, went on to conclude that the record on appeal would not support the prosecutor's demeanor-based reasons for excusing *Elizabeth G.* because "[the trial court] did not respond to or even acknowledge defendant's comment that there was nothing in [her] demeanor that would justify excusing her. Defendant's statement demonstrated his disagreement with the prosecutor's assessment that Elizabeth G. was not paying attention and was not involved in the process. Neither the trial court's initial comments nor its subsequent comments contain any *particularized assessment* of the prosecution's justifications." (Italics added.)

In support of its conclusion that the trial court was required to make a record that included a "particularized assessment of the prosecution's justifications" for peremptorily challenging Elizabeth G., the Court of Appeal placed principal reliance on our holding in *Silva, supra,* 25 Cal.4th 345, finding it controlling here. That reliance was misplaced.

D. *Silva*

The *Wheeler* motion in *Silva* arose in the context of a retrial of the penalty phase of a capital murder prosecution. "Early in the jury selection process for the penalty retrial, the prosecutor revealed an acute sensitivity to the presence of Hispanics on the jury panel and an evident belief that Hispanics would not be favorable jurors for the prosecution. The first penalty phase had resulted in a hung jury, with the final vote seven for a sentence of death and five for a sentence of life imprisonment without parole. Before the penalty retrial, the defense challenged the jury panels as not providing a fair cross-section of the community, and the prosecutor said this: 'I also believe that [defense counsel] has only made a record on Hispanic surnames and has not included any other races, creeds, or colors such as black, oriental because *the first trial hung up on racial grounds.* [Defense counsel] is well aware that *four of the five people in the first trial were Mexican-Americans or at least had those surnames that voted for life without possibility of parole.* And I believe that [defense counsel] is trying to influence this court, at this time, so that he gets the same type of a panel he got on the first trial.' (Italics added.)

"Some days later, the prosecutor again said he believed the hung jury in the first penalty trial 'was based on race.' Eventually the prosecutor explained: 'When I was speaking to the jurors that voted for life without parole, four of those jurors were in fact Hispanic . . . [and] one of the Hispanic jurors turned to the only Hispanic juror who voted for death and said, "You let us down," meaning "You are Hispanic. We are Hispanic. We are a group." And "You let us down because you didn't vote for life without parole." That's what I based my comment on.' Despite his stated belief that the hung jury during the first penalty trial was attributable to the racial or ethnic bias of Hispanic jurors, the prosecutor denied that he would exercise any peremptory challenge 'on the basis of race, creed or color.' But the implausible explanations that the prosecutor later gave for exercising peremptory challenges to exclude *every* Hispanic from the jury at the retrial of penalty raise grave doubts about the sincerity of this statement." (*Silva, supra,* 25 Cal.4th at pp. 375–376.)

The defense in *Silva* made its first *Batson/Wheeler* motion to dismiss the panel and begin jury selection anew after the prosecutor had exercised peremptory challenges against three prospective jurors with Hispanic ancestry or surnames. The trial court found a prima facie case and asked the prosecutor to explain the reasons for the challenges. During the brief hearing, at which the prosecutor gave his reasons for exercising the three challenges, "the trial court did not ask the prosecutor any questions and did not remark on any discrepancies between the prosecutor's stated reasons and the prospective jurors' responses on voir dire or on their questionnaires. When proceedings resumed in the presence of defendant and defense counsel, the trial court

denied the first *Batson/Wheeler* motion. The court said only that the prosecutor 'did provide an explanation with regard to' the three peremptory challenges and that 'I think that there was a good excuse with regard to all of these people.' " (*Silva, supra,* 25 Cal.4th at p. 382.)

As the penalty phase jury voir dire proceeded in *Silva*, the defense renewed its *Batson/Wheeler* motion after the prosecutor had exercised peremptory challenges against two more Hispanic prospective jurors. Once again, the trial court required the prosecutor to give his reasons for the challenges. (*Silva, supra,* 25 Cal.4th at pp. 382–383.) The transcript of that second hearing comprised a single page. Again the trial court failed to question the prosecutor "or remark on the apparent disparity between [his] stated reasons and what the record shows to have occurred during voir dire. When proceedings resumed in the presence of defendant and defense counsel, the court said only this: 'I did hear the explanations presented by the prosecutor with regard to peremptory challenges exercised against Rosalinda [R.] and Ernestina [R.], and they appear to be very valid reasons for those excuses.' As a result of the prosecutor's peremptory challenges and the trial court's rulings, no Hispanic served on the jury that returned the verdict selecting the penalty of death." (*Id.* at p. 383.)

On appeal, the defendant in *Silva* challenged the denial of his *Batson/Wheeler* motion. We focused in particular on the voir dire of one prospective juror, Jose M. We reviewed the record of the voir dire proceedings and found that the prosecutor's reasons for peremptorily excusing Jose M. were contradicted by the record. We then explained, "[W]e agree with defendant that the court erred in denying the motion as to Prospective Juror Jose M. Nothing in the transcript of voir dire supports the prosecutor's assertions that M. would be reluctant to return a death verdict or that he was 'an extremely aggressive person.' . . . [H]ere, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge against M., and the trial court has failed to probe the issue [citations]. We find nothing in the trial court's remarks indicating it was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against M. and the facts as disclosed by the transcripts of M.'s voir dire responses. On this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' (*People v. Hall* (1983) 35 Cal.3d 161, 167–168 [197 Cal.Rptr. 71, 672 P.2d 854]) and to clearly express its findings (*People v. Fuentes[, supra]* 54 Cal.3d 707, 716, fn. 5)." (*Silva, supra,* 25 Cal.4th at p. 385.)

We concluded in *Silva* that "the trial court's ultimate determination—that defendant failed to meet his burden of proving intentional discrimination with

respect to the prosecutor's peremptory challenge of Prospective Juror M.—is unreasonable in light of the evidence of the voir dire proceedings. Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] *When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.* As to Prospective Juror M., both of the prosecutor's stated reasons were factually unsupported by the record. Because the trial court's ultimate finding is unsupported—at least as to Prospective Juror M.—we conclude that defendant was denied the right to a fair penalty trial in violation of the equal protection clause of the federal Constitution (*Batson v. Kentucky, supra,* 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712]) and was denied his right under the state Constitution to a trial by a jury drawn from a representative cross-section of the community (*People v. Wheeler, supra,* 22 Cal.3d 258, 276–277)." (*Silva, supra,* 25 Cal.4th at pp. 385–386.)

E. *The Peremptory Challenge of Elizabeth G.*

Returning to the facts of this case, we agree with the observation of the Court of Appeal below that "[t]he reasons given by the prosecutor in *Silva, supra,* 25 Cal.4th 345, were contradicted by the record and were thus implausible and unsupported by the record." In that regard, the Court of Appeal read *Silva* right. We further agree with the Court of Appeal's observation that here, in contrast, "the record does not contradict the reasons given [by the prosecutor in this case]." But we cannot agree with the Court of Appeal's further conclusion that, under our holding in *Silva,* the record on appeal in this case does not support the prosecutor's stated reasons for exercising a peremptory challenge against Elizabeth G.,[5] or the trial court's express determination that those reasons were sincere and genuine. It was not this court's intention that the holding in *Silva* should be so expansively applied to cases with facts as different from *Silva*'s as those now before us.

Here, the prosecutor first indicated, in response to the finding of a prima facie case below, that he had excused Elizabeth G. because she was a

---

[5] The genuineness of the prosecutor's peremptory challenge to the second Hispanic prospective juror, Mary L., was accepted by the Court of Appeal and did not appear to play a part in the reversals below: "In contrast [to Elizabeth G.'s excusal,] the prosecutor's reasons for excluding [Mary L.] [she was a counselor for at-risk youth and would have undue sympathy for both defendants because they are young and at risk] included 'a neutral explanation related to the particular case to be tried.' (*Batson v. Kentucky* (1986) 476 U.S. 79, 98 [90 L.Ed.2d 69, 106 S.Ct. 1712].)"

customer service representative, and that "[i]n terms of that, we felt that she did not have enough educational experience." The Court of Appeal concluded that this reason "was not supported by the record and lacked any content related to the case being tried."

■ The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. (*Purkett, supra,* 514 U.S. at p. 769.) So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and *nondiscriminatory* reason for exercising the challenge. (*Ibid.*) It matters not that another prosecutor would have chosen to leave the prospective juror on the jury. Nor does it matter that the prosecutor, by peremptorily excusing men with long unkempt hair and facial hair on the basis that they are specifically biased against him or against the People's case or witnesses, may be passing over any number of conscientious and fully qualified potential jurors. All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory. "[A] 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. [Citations.]." (*Ibid.*)

We acknowledge that, when viewed objectively, the notion that *all persons* employed as customer service representatives would have insufficient "educational experience" to effectively serve on juries is of questionable persuasiveness. ■ But the proper function of the reviewing court in a case such as this is not to objectively validate or invalidate such a broadly stated premise. The proper function on review in this case was to determine whether the trial court's conclusion—that the prosecutor's *subjective* race-neutral reasons for exercising the peremptory challenges at issue here were sincere, and that the defendants failed to sustain their burden of showing "from all the circumstances of the case" (*Wheeler, supra,* 22 Cal.3d at p. 280) a strong likelihood that the peremptory challenges in question were exercised on improper grounds of group bias—is supported by the record when considered under the applicable deferential standard of review.

Here, at a bare minimum, Elizabeth G.'s occupation as a customer service representative was confirmed by her answers to the general questions, as were the additional circumstances that she had no prior jury experience and no past contact with the criminal justice system in any capacity. ■ If a prosecutor can lawfully peremptorily excuse a potential juror based on a hunch or suspicion, or because he does not like the potential juror's hairstyle, or because he observed the potential juror glare at him, or smile at the defendant

or defense counsel, then surely he can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected.[6] As the Court of Appeal itself observed, this was a *murder* case, with two codefendants whose roles in the criminal episode were distinct. A prosecutor arguably could conclude in sincerity that a prospective juror employed in customer service, with no prior jury experience, no prior contact with the criminal justice system, and who further appeared to be inattentive and uninvolved in the jury selection process, would not be the best type of juror for the case. Such a determination might further be supported by a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from the cold transcribed record on appeal.

The trial court was obligated to evaluate "all the circumstances of the case" in the step three evaluation of whether the prosecutor's race-neutral reasons for peremptorily excusing Hispanic Potential Jurors Mary L. and Elizabeth G. were sincere and credible, or whether the defendants instead had sustained their burden of proving unlawful discriminatory intent in the exercise of the peremptory challenges. (*Wheeler, supra,* 22 Cal.3d at p. 280.) With regard to the first reason given in justification of the peremptory challenge of Elizabeth G., the question for the trial court was *not* whether, objectively speaking, *all customer service representatives* lack sufficient "educational experience" to sit on a jury (a dubious notion when viewed in isolation) or even whether, subjectively speaking, Elizabeth G., who was employed as a customer service representative, herself had insufficient "educational experience" to sit on the jury. ■ The question for the trial court was this: was the reason given for the peremptory challenge a "legitimate reason," legitimate in the sense that it would not deny defendants equal protection of law (see *Purkett, supra,* 514 U.S. at p. 769), or was it a disingenuous reason for a peremptory challenge that was in actuality exercised solely on grounds of group bias?

The prosecutor also gave as his second, demeanor-based reason for excusing Elizabeth G., that it appeared to him she was not paying attention to the proceedings, and that he felt she was not sufficiently involved in the jury selection process to make a good juror. Here again, at a bare minimum, the record of Elizabeth G.'s answers to the questions posed to all the prospective jurors reflects that she had no prior jury experience and no prior contact with the criminal justice system in any capacity. Unlike the reasons given by the

---

[6] Indeed, an attorney could peremptorily excuse a potential juror because he or she feels the potential juror's occupation reflects *too much education*, and that a juror with that particularly high a level of education would likely be specifically biased against their witnesses, or their client's position in the case. As long as such a peremptory challenge was nondiscriminatory and "legitimate" in the sense that it does not deny equal protection of the law (*Purkett, supra,* 514 U.S. at p. 769), it would be lawful and valid.

prosecutor in *Silva*, the prosecutor's reasons given in this case for peremptorily excusing Elizabeth G. were neither inherently implausible, nor affirmatively contradicted by anything in the record.

The Court of Appeal focused, in particular, on this second, demeanor-based justification given for the excusal of Elizabeth G., and found it significant that the trial court made no attempt to clarify or probe the prosecutor's reasons for finding Elizabeth G.'s demeanor while in the jury box unsuited to jury service. But the trial court did expressly accept the prosecutor's race-neutral reasons for the peremptory challenge to Elizabeth G., finding them sincere and genuine. ■ Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing Elizabeth G., including the demeanor-based reason, were sincere and genuine, is entitled to "great deference" on appeal. (*Batson, supra*, 476 U.S. at p. 98, fn. 21; *Johnson, supra*, 47 Cal.3d at p. 1221.) Nor have we found anything in the record to directly contradict the trial court's express findings to that effect, in contrast to the facts of *Silva*. To the contrary, the prosecutor passed and accepted the jury *14 times* with Elizabeth G. seated in the jury box (on four of those occasions, a second Hispanic prospective juror, Carolyn G., was also seated on the jury when the prosecutor passed and accepted it). Although not a conclusive factor, "the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection . . . ." (*People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452].) If the prosecutor's occupation- and demeanor-based reasons for excusing Elizabeth G. were indeed pretextual, and he was in actuality bent on removing her from the jury because of her Hispanic ancestry,[7] his acceptance of the jury *14 times* with Elizabeth G. seated in the jury box, on four such occasions with a second Hispanic prospective juror also seated on the jury, was hardly the most fail-safe or effective way to effectuate that unconstitutional discriminatory intent.

---

[7] Recently, in *People v. Johnson, supra*, 30 Cal.4th at page 1326, a majority of this court reached the following conclusion with regard to a *Wheeler* claim: "Defendant stresses that the district attorney used three of his 12 peremptory challenges to remove all three African-American prospective jurors, and this case involves an African-American defendant charged with killing 'his White girlfriend's child.' These circumstances are obviously highly relevant to whether a prima facie case existed. (*Wheeler, supra*, 22 Cal.3d at pp. 280–281.) They definitely warranted the trial court's careful scrutiny, which that court gave. The court considered the question close but found no prima facie case under all the circumstances. We will not second-guess its determination . . . ."

Here, in contrast, both the defendants *and the murder victim* were of Hispanic ancestry, a circumstance that might be viewed as neutralizing any suspected untoward belief on the prosecutor's part that Hispanic jurors would tend to be biased in favor of, and thereby be more inclined to vote to acquit, the Hispanic defendants.

Finally, the Court of Appeal reasoned that "in rejecting defendant's argument, rather than focusing on the question of validity of the People's justifications, the trial court attempted to buttress its finding by analyzing a Hispanic juror [Carolyn G.] not challenged by the People, but excused by the defense." The Court of Appeal concluded that "the [trial] court erred when, *for whatever reason*, it commented on the fact that the defense itself had challenged a Hispanic prospective juror ([Carolyn G.])." (Italics added.)

It is of course settled that "the propriety of the prosecutor's peremptory challenges must be determined without regard to the validity of defendant's own challenges." (*People v. Snow, supra,* 44 Cal.3d at p. 225; *Wheeler, supra,* 22 Cal.3d at p. 283, fn. 30.) But we read this record differently than did the Court of Appeal, and differently than does dissenting Justice Kennard, who finds the trial judge's remarks to have been a "pointless digression." (Dis. opn. of Kennard, J., *post,* at p. 933.) Instead, we find that the trial court did not transgress the holding in *Snow* when commenting that defendants themselves had peremptorily excused a Hispanic prospective juror, Carolyn G.[8]

The relevant segment of the record is quoted above. (*Ante,* at pp. 911–912.) Defendant Julian Reynoso's counsel urged the court to conclude that because the prosecution would be expected to want a juror with law enforcement contacts to serve on the jury, the peremptory excusal of Elizabeth G., who had a friend in the Porterville Police Department and a brother who worked for the Department of Corrections, must have been motivated by improper racial or group bias. The trial court responded that Prospective Juror Carolyn G. likewise had law enforcement contacts (a brother-in-law in the Merced Police Department) and was not peremptorily challenged by the prosecutor, *even though she was also of Hispanic ancestry.* It is true that Carolyn G. was ultimately excused by the defense, but that was not the court's focus. The court's point was simply this: if defense counsel's threshold premise was true,

---

[8]Justice Kennard also assails the trial court for using the term "systematic exclusion" in denying the *Batson/Wheeler* motion, suggesting the court thereby applied a wrong or outdated standard. (Dis. opn. of Kennard, J., *post,* at pp. 933–934.) Not so. Since the day the seminal decisions in *Wheeler* and *Batson* were each decided, it has been clearly understood that the unconstitutional exclusion of even a single juror on improper grounds of racial or group bias requires the commencement of jury selection anew, or reversal of the judgment where such error is established on appeal. (*Batson, supra,* 476 U.S. at p. 95 [equal protection clause]; *Wheeler, supra,* 22 Cal.3d at p. 282 [Cal. Const. right to trial by representative jury].) We long ago observed that although the well-worn phrase "systematic exclusion" is somewhat of a misnomer when used to describe a discriminatory use of peremptory challenges (since a single discriminatory and therefore unconstitutional exclusion will constitute *Wheeler* error), this and other courts have used and understood that term as an acceptable shorthand phrase for denoting *Wheeler* error. (*Fuentes, supra,* 54 Cal.3d at p. 716, fn. 4.) That observation having been made by this court nearly 13 years ago in *Fuentes,* it hardly seems fair or appropriate to fault this trial judge for using the term once in passing when denying the *Batson/Wheeler* motion, much less to conclude that a wrong standard was applied in ruling on the motion.

then the prosecutor, consistent with that premise, had indeed not excused Carolyn G. given her favorable law enforcement contacts, *notwithstanding her Hispanic ancestry*. In context, the point the trial court was obviously trying to make was that the prosecutor *did* seek to retain jurors with law enforcement contacts who would normally be deemed favorable to the prosecution, including Carolyn G., who was Hispanic. By parity of reasoning, one might expect the prosecutor to have likewise sought to retain Prospective Juror Elizabeth G. who, like Carolyn G., had such favorable law enforcement contacts, notwithstanding *her* Hispanic ancestry, and that Elizabeth G. would have been retained were it not for the other reasons of specific bias which the prosecutor indicated had in fact motivated him to excuse her (her perceived lack of "educational experience" given her occupation, coupled with her apparent inattentiveness and lack of involvement in the jury selection proceedings).

We are confident the trial court's intended point was not that *the defense* had also excused Carolyn G., a Hispanic prospective juror, which might constitute error under *People v. Snow, supra,* 44 Cal.3d at page 225, but rather that *the prosecutor had not* sought to peremptorily challenge her. That circumstance, when scrutinized under the premise defense counsel was arguing to the court, would suggest there was nothing inconsistent in the prosecutor's treatment of Hispanic Prospective Jurors Elizabeth G. and Carolyn G., and would support the inference that the prosecutor's race-neutral reasons for challenging Elizabeth G. were sincere. Perhaps not the most artfully stated point, but in context, the trial court's intended point is clear enough. Under a fair reading of the record, the trial court did not attempt to refute the defense *Batson/Wheeler* motion by urging that the defense itself committed *Batson/Wheeler* error.[9]

---

[9] Our dissenting colleagues urge that it cannot be known with certainty whether the prosecutor would in fact not have peremptorily challenged Hispanic Prospective Juror Carolyn G., had the defense not itself first peremptorily excused her. The point merely echoes the Court of Appeal's inappropriate speculation when that court noted that "[w]hether the People would have challenged [Carolyn G.] cannot be known because she was eliminated from the jury pool by the defense and at the time the *Wheeler* motion was made there were no Hispanic jurors remaining." ■ An appellate court's proper role in reviewing a *Batson/Wheeler* claim is not to engage in speculation, but to instead draw appropriate inferences from the record under the deferential standard made applicable by this court in *Wheeler,* and by the high court in *Batson.* What *is* clearly established by this record is that the prosecutor passed and accepted the jury with Carolyn G. seated in the jury box *four times* before the defense elected to peremptorily excuse her. The record lends no support to the insinuation that the prosecutor "might" have challenged Hispanic Prospective Juror Carolyn G., had the defense not first done so. It *does* unequivocally establish that the prosecutor repeatedly passed and accepted the jury in this case with each of the three Hispanic prospective jurors in question seated in the jury box, and on *four occasions,* passed and accepted the jury with *both* Hispanic Prospective Jurors Elizabeth G. and Carolyn G. seated on the jury. That state of the record in turn lends support to an

We are mindful that in *Fuentes, supra,* 54 Cal.3d 707, we "reemphasize[d] the trial court's role in making an adequate record when dealing with a *Wheeler* motion. Notwithstanding the deference we give to a trial court's determinations of credibility and sincerity, we can only do so when the court has clearly expressed its findings and rulings and the bases therefor." (*Id.* at p. 716, fn. 5.) But neither *Fuentes* nor *Silva* requires a trial court to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge. The impracticality of requiring a trial judge to take note for the record of each prospective juror's demeanor with respect to his or her ongoing contacts with the prosecutor during voir dire is self-evident.

 Where, as here, the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible (*Silva, supra,* 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge.

Having considered all the circumstances of this case (*Wheeler, supra,* 22 Cal.3d at p. 280), we find nothing in the record to contradict the trial court's determination that no *Wheeler* error occurred, nor any reason to deviate from the customary "great deference" normally afforded such rulings. (*Batson, supra,* 476 U.S. at p. 98, fn. 21.)

### III. CONCLUSION

The judgments of the Court of Appeal are reversed and these matters remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Chin, J., and Brown, J., concurred.

**KENNARD, J.** —I dissent. I would affirm the Court of Appeal's judgment, which found that the trial court committed reversible error when it denied a

---

inference that the prosecutor in this case was not exercising his peremptory challenges on the sole and improper ground of group bias. (*People v. Snow, supra,* 44 Cal.3d at p. 225.)

defense motion asserting that the prosecutor engaged in purposeful discrimination when he used peremptory challenges to strike two Hispanic women from the jury. The Court of Appeal concluded that the trial court's ruling violated both the federal Constitution as construed by the United States Supreme Court in *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and the California Constitution as construed by this court in *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).

The majority's decision reversing the Court of Appeal undermines the right of Hispanics to sit on juries in California state courts and the right of criminal defendants to jury-selection procedures free of purposeful discrimination against Hispanic prospective jurors. Here, the prosecutor said he struck a Hispanic woman from the jury because she was insufficiently educated and because she was not paying attention. Although the defense disputed both of these factual assertions, the trial court denied the defendants' *Batson/Wheeler* motion without questioning the prosecutor, without making particularized findings, and by misstating the proper legal standard. Brushing all this aside, the majority indulges a presumption that both the prosecutor and the trial court acted properly, thereby adopting a standard of appellate review that effectively insulates discriminatory strikes from meaningful scrutiny at both the trial and appellate stages. For the reasons that follow, I disagree.

The use of peremptory challenges to eliminate prospective jurors because of group bias—that is, bias based on the juror's race, gender, ethnic background, or similar cognizable characteristic—is prohibited by the federal Constitution (*Powers v. Ohio* (1991) 499 U.S. 400, 409 [113 L.Ed.2d 411, 111 S.Ct. 1364]; *Batson, supra,* 476 U.S. at p. 89) and by the California Constitution (*Wheeler, supra,* 22 Cal.3d at pp. 276–277). A defendant claiming a prosecutor has exercised peremptory challenges because of group bias must make a timely objection and establish a prima facie case of prohibited discrimination. (*People v. McDermott* (2002) 28 Cal.4th 946, 969 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

The United States Supreme Court has explained the three-step procedure a trial court must follow in ruling on a *Batson* motion: "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769].)

Here, in step one, the trial court found that the defense had made a prima facie case of improper discrimination, and the court asked the prosecutor to explain his peremptory challenges against the two Hispanic jurors. In step two, the prosecutor said he excused one of them, Elizabeth G., "because she was [a] customer service representative" and "[i]n terms of that, we felt she did not have enough educational experience" and because "it seemed like she was not paying attention to the proceedings and the People felt that she was not involved in the process." These reasons are facially neutral as to Hispanic ancestry, as the trial court recognized by saying: "I accept those reasons as being not based upon race or ethnicity."

The issue here concerns step three, whether the defense "proved purposeful racial discrimination." (*Purkett v. Elem, supra,* 514 U.S. at p. 767.) As the United States Supreme Court has said, "the critical question in determining whether a [party] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, [154 L.Ed.2d 931, 123 S.Ct. 1029]; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 196 [58 Cal.Rptr.2d 385, 926 P.2d 365] [stating that the issue is "whether the prosecutor acted with the prohibited intent," which in turn depends on "whether the prosecutor's customary denial of such intent is true"].) The high court added that, "[a]t this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' " (*Miller-El v. Cockrell, supra,* at p. 339 [123 S.Ct. at p. 1040].)

As the majority admits, the prosecutor's explanation that he challenged Elizabeth G. because her occupation as a sales representative showed inadequate education is "of questionable persuasiveness" (maj. opn., *ante,* at p. 924) and "a dubious notion" (*id.* at p. 925). But the majority refuses to acknowledge that by offering this implausible justification, the prosecutor triggered specific duties that this court has imposed on trial courts: first, to question the prosecutor to determine whether the offered justification, though implausible, was genuine rather than a pretext for purposeful discrimination, and, second, to make particularized findings resolving this credibility issue.

As this court explained in *People v. Fuentes* (1991) 54 Cal.3d 707 [286 Cal.Rptr. 792, 818 P.2d 75] (*Fuentes*) and reemphasized in *People v. Silva* (2001) 25 Cal.4th 345 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*), a trial court, when it rules on a *Batson/Wheeler* motion, must make a sincere and reasoned effort to evaluate the credibility of a prosecutor's explanation for using peremptory challenges against prospective jurors of a particular race or other cognizable group (*Silva, supra,* at p. 386; *Fuentes, supra,* at p. 720), and the trial court should make express, particularized findings as to each juror that the prosecutor has challenged and each reason that the prosecutor has offered

(*Silva, supra,* at pp. 385–386; *Fuentes, supra,* at p. 716, fn. 5). When the trial court has not conducted any inquiry and has not made any particularized findings, but the prosecutor's explanations are both plausible and supported by the record, this court has not found reversible error in the denial of the defense motion. (*Silva, supra,* at p. 386.) But when, as here, the prosecutor has given a highly implausible reason for striking a prospective juror, and the trial court has not conducted any meaningful inquiry or made any particularized findings, an appellate court cannot indulge a presumption, belied by the record, that the trial court discharged its duty to make a sincere and reasoned effort to evaluate the credibility of the prosecutor's explanation. (See *Silva, supra,* at p. 386.) In this situation, as the Court of Appeal correctly held, an appellate court must treat the unexplained denial of the defense motion as reversible error.

The prosecutor's second reason for striking Elizabeth G.—that she was not paying attention—is equally problematic. As the Court of Appeal correctly observed, and as the majority does not dispute, nothing in Elizabeth G.'s responses, nor anything else in the appellate record, indicated she was not paying attention. Of course, her demeanor could have conveyed the impression that she was not paying attention, and body language of that sort can be a proper basis for peremptory challenge. (*Fuentes, supra,* 54 Cal.3d at pp. 714–715.) But in the trial court the defense directly challenged the prosecutor's assertion, saying "[t]here was nothing in her responses or her demeanor that justif[ied] just excusing her . . . ." This contrary assertion created a factual dispute for the trial court to resolve. The court could easily have done so by saying whether its own observations of Elizabeth G. confirmed or refuted the prosecutor's claim that she had not been paying attention. But the trial court did not resolve the dispute in this way, nor did the court question the prosecutor to determine, if possible, what particular aspect of Elizabeth G.'s demeanor may have caused the prosecutor to conclude, if he actually did, that she was not paying attention.

Rather than resolving the factual dispute by an express finding or by a focused inquiry, the trial court attempted to respond to another aspect of the defense argument. Defense counsel had asserted that because Elizabeth G. had ties to persons in law enforcement (specifically, friends in the Porterville Police Department and a brother who worked for the California Department of Corrections), she had characteristics normally considered favorable to the prosecution. Noting that the defense itself had exercised a peremptory challenge against a Hispanic juror named Carolyn G., the trial court addressed defense counsel with these words: "[Y]ou argued that even a person who the People should want to have on, namely law enforcement background may still kick off because of being Hispanic. I'm just pointing out that

[Carolyn G.] was another person that is Hispanic background but they did not kick off and I believe her background was that she had been the one who had been kidnapped."

The majority asserts: "We are confident the trial court's intended point was not that *the defense* had also excused Carolyn G., a Hispanic prospective juror, which might constitute error under *People v. Snow* [1987] 44 Cal.3d [216], 225 [242 Cal.Rptr. 477, 746 P.2d 452], but rather that *the prosecutor had not* sought to peremptorily challenge her." (Maj. opn., *ante*, at p. 928.) But there was no way to determine whether the prosecutor would have challenged Carolyn G. had the defense not done so first, and also, as defense counsel tried to explain, the prosecutor could have thought that Carolyn G.'s experience as a crime victim would make her favor the prosecution, thus outweighing what the prosecutor may have viewed as the undesirable fact of her Hispanic heritage. Thus, the discussion about Prospective Juror Carolyn G. did nothing to address the central issue before the trial court, which was the credibility of the reasons the prosecutor had given for striking Elizabeth G. The trial court's willingness to engage in this pointless digression can only undermine an appellate court's confidence that the trial court understood and discharged its duty.

Here again, an appellate court cannot indulge a presumption, belied by the record, that the trial court discharged its duty to make a sincere and reasoned effort to evaluate the credibility of the prosecutor's explanation. (See *Silva, supra,* 25 Cal.4th at p. 386.)

Another of the trial court's comments supplies yet another reason not to presume that the court correctly applied the teachings of this court and the United States Supreme Court. In denying the defense *Batson/Wheeler* motion, the trial court said: "I don't find that there has been a violation of *Wheeler* and that the—there was not a *systematic exclusion* of a recognized ethnic group, i.e., Hispanics in this case." (Italics added.)

But as this court has explained, a showing of systematic exclusion is not required to establish a *Batson/Wheeler* violation. "California law makes clear that a constitutional violation may arise even when only one of several members of a 'cognizable' group was improperly excluded." (*People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277], citing *Fuentes, supra,* 54 Cal.3d at pp. 714–715, fn. 4.) Accordingly, "a *Wheeler* violation does not require 'systematic' discrimination." (*People v. Arias* (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

The United States Supreme Court has also expressly rejected the notion that the defense must show systematic exclusion to establish a claim that the

prosecution has purposefully discriminated in the exercise of peremptory challenges. In *Batson, supra,* 476 U.S. 79, the high court overruled its decision in *Swain v. Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824], which had required a defendant to prove systematic discrimination in the sense of repeated exclusion of all members of a minority race in case after case. (*Batson, supra,* at p. 100, fn. 25.) In *Batson,* the court characterized this as a "crippling burden of proof" that made peremptory challenges by the prosecution "largely immune from constitutional scrutiny." (*Batson, supra,* at pp. 92–93.) Rejecting that approach, the court announced that " '[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " (*Id.* at p. 95.) Thus, under *Batson* as under *Wheeler,* purposeful discrimination in the exercise of a single peremptory challenge is sufficient to establish a constitutional violation requiring reversal of a judgment based on a verdict of the improperly selected jury. (*Silva, supra,* 25 Cal.4th at p. 386.)

Here, the trial court's invocation of the long-abandoned "systematic exclusion" standard raises serious doubts that the trial court correctly understood and applied the analysis required by *Batson, supra,* 476 U.S. 79, and *Wheeler, supra,* 22 Cal.3d 258. The court's apparent reliance on this repudiated standard may explain its digression concerning Carolyn G. The court may well have reasoned that because the prosecution had not challenged *all* Hispanic jurors (although the jury ultimately selected included none), the defense had failed to establish systematic exclusion, and the court may have denied the motion on this erroneous reasoning.

Citing a footnote in *Fuentes,* the majority asserts that, in the *Batson/Wheeler* context, the term "systematic exclusion," although "somewhat of a misnomer," is "an acceptable shorthand phrase for denoting *Wheeler* error." (Maj. opn., *ante,* at p. 927, fn. 8.) *Fuentes* says nothing of the sort. What this court said was that "[t]he term [systematic exclusion] is not apposite in the *Wheeler* context, for a single discriminatory exclusion may violate a defendant's right to a representative jury." (*Fuentes, supra,* 54 Cal.3d at p. 716, fn. 4.) In other words, the term "systematic exclusion," far from being acceptable, is wrong and misleading, and this court disapproved its use in this context. In the 12 years since *Fuentes,* this court has never used the term "systematic exclusion" to describe the step three *Batson/Wheeler* inquiry. Nonetheless, trial courts and at least one Court of Appeal still use this inapposite term and, by this usage, are led to a mistaken understanding of the issue at stake. (See, e.g., *People v. Robinson* (2003) 110 Cal.App.4th 1196 [122 Cal.Rptr.3d 465], [erroneously stating that "[a] *Wheeler* motion challenges the selection of a jury, not the rejection of an individual juror; the issue is whether a pattern of systematic exclusion exists"].) The record shows that the trial court here made the very same, very basic mistake.

The majority relies on the general rule that reviewing courts give great deference to a trial court's findings when ruling on a *Batson/Wheeler* motion because those findings "largely will turn on evaluation of credibility." (*Batson, supra,* 476 U.S. at p. 98, fn. 21.) But a trial court's credibility determination is entitled to deference only if the court made a sincere and reasoned effort to evaluate each stated justification as applied to each challenged juror. (*People v. McDermott, supra,* 28 Cal.4th at p. 970; *People v. Jackson* (1996) 13 Cal.4th 1164, 1197 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Montiel, supra,* 5 Cal.4th at p. 909.) Appellate deference is unwarranted where, as here, the appellate record supplies many reasons to doubt that the trial court even made a credibility determination, much less a determination resulting from a sincere and reasoned effort. (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1016–1017 [30 Cal.Rptr.2d 851].) To summarize, the prosecutor's reasons were inherently implausible (insufficient education) and disputed and unverifiable (inattention), yet the trial court (1) did not question the prosecutor or make any other relevant inquiry, (2) made no express findings relevant to credibility, (3) engaged in a pointless digression about a defense peremptory challenge, and (4) couched its ruling in terms of the repudiated "systematic exclusion" standard.

Both this court and the United States Supreme Court have established safeguards to prevent parties from using peremptory challenges to remove prospective jurors on the basis of group bias—that is, bias based on the juror's race, gender, ethnic background, or similar cognizable characteristic. These safeguards include procedures at both the trial and appellate level. The majority's holding here substantially weakens these safeguards and misapplies controlling precedent. Therefore, I dissent.

Werdegar, J., and Moreno, J., concurred.

**MORENO, J.,** Dissenting.—"[R]acial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' [citation] and places the fairness of a criminal proceeding in doubt. [¶] The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. [Citation.] The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. 'Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . .' " (*Powers v. Ohio* (1991) 499 U.S. 400, 411 [113 L.Ed.2d 411, 111 S.Ct. 1364].) "The diverse and representative character of the jury must be maintained . . . ." (*J.E.B. v. Alabama* (1994) 511 U.S. 127, 134 [128 L.Ed.2d 89, 114 S.Ct. 1419].) Because today's majority opinion shelters a prosecutor's pretextual peremptory challenge of a Hispanic juror from further inquiry by the trial court, I dissent.

*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) requires a three-step process when a party claims an opponent has discriminatorily exercised a peremptory challenge against a prospective juror on the basis of race, religion, ethnicity, gender, or other cognizable group bias: "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769].)

In *People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769] (*Silva*), our concern was with step three of this process, "whether the record as a whole shows purposeful discrimination." We then held that "[w]hen the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are *either* unsupported by the record [*or*] inherently implausible . . . more is required of the trial court than a global finding that the reasons appear sufficient." (*Id.* at p. 386, italics added.) Under such circumstances, the trial court has two obligations: "to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' (*People v. Hall* (1983) 35 Cal.3d 161, 167–168 [197 Cal.Rptr. 71, 672 P.2d 854]) and to clearly express its findings. (*People v. Fuentes* (1991) 54 Cal.3d 707, 716, fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75].)" (*Id.* at p. 385.)

## PROCEEDINGS BELOW

At the step two hearing, the prosecutor asserted that he challenged Hispanic Prospective Juror Elizabeth G. because she was a "customer service representative" and "[i]n terms of that, we felt that she did not have enough educational experience." He added, "It seemed she was not paying attention to the proceedings and the People felt that she was not involved in the process." The trial court did not afford the defense an opportunity to respond to this proffer and instead issued a global finding: "I accept those reasons as being not based upon race or ethnicity. . . . So the motion is denied."

Counsel for Julian Reynoso then asked if he could "make a couple [of] points for the record" and the court consented.[1] The following colloquy took place:

---

[1] In *People v. Johnson* (2003) 30 Cal.4th 1302, 1324–1325 [1 Cal.Rptr.3d 1, 71 P.3d 270], we held that "a reviewing court should not attempt its own comparative juror analysis for the first time on appeal," but "[w]hen the objecting party presents comparative juror analysis to the trial court, the reviewing court must consider that evidence, along with everything else of

"[Counsel for Julian]: And a couple [of] points for the record is that [the prosecutor] passed on [Elizabeth G.] about seven or eight times. Then when I think he sensed that the defense was getting ready to pass, then it excused [Elizabeth G.]. There's nothing about what [Elizabeth G.] said in terms of her background that would make her be sympathetic to the defendants in this case, when she said she was a customer service rep. Her husband is a construction supervisor. [¶] She's got friends in the Porterville [Police Department], her brother or brother-in-law works for the California Department of Corrections. There was nothing in her responses or her demeanor that would justify just excusing her other than it being a race-based exclusion is our position.

"The Court: And I believe that there was another Hispanic that was excused not by the People, but by the defense, and that was [Carolyn G.].

"[Counsel for Julian]: That was a legitimate reason. I didn't excuse her.

"The Court: I'm not saying it wasn't legitimate. You just brought up—I'm not arguing with you, but I want the record to be clear, you argued that even a person who the People should want to have on, namely law enforcement background, may still kick off because of being Hispanic. I'm just pointing out that [Carolyn G.] was another person that is Hispanic background but they did not kick off and I believe her background was that she had been the one who had been kidnapped.

"[Counsel for Julian]: Right. I would say she would want to be kept on by the People because she's been a victim of a violent crime at gunpoint.

"The Court: But your argument was that so should the other person [Elizabeth G.] because they had law enforcement background.

"[Counsel for Julian]: I didn't say she was law enforcement background.

"The Court: I thought you said—

"[Counsel for Julian]: I was looking over my notes in terms of what [Elizabeth G.] said in answer to the nine questions that are up on the little poster. She responded that she has friends in the Porterville [Police Department].

relevance, in reviewing, deferentially, the trial court's ruling." In light of *Johnson*, it is incumbent upon objecting parties to make a full record at step two or step three of a *Batson/Wheeler* hearing. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].)

"The Court: Right. Law enforcement people.

"[Counsel for Julian]: And a brother who works for California Department of Corrections. So I'm just saying that based on those responses, there's no legitimate reason to exclude her based on those responses other than the fact that she has her—she's Hispanic. I'm trying to make that for the record. [¶] [The prosecutor] argued that [Mary L.] would be sympathetic because she works with at risk youth. That's his reason for excusing her. But for the record also the reason [Carolyn G.] was excused, as I understand it from [counsel for John Reynoso], is because she was a victim of violent crime where guns were involved. That's what we have here.

"The Court: Okay. Thank you.

"[The Prosecutor]: I'd like the record to reflect that defense counsel also had a challenge to [Mrs. T.] [who] seemed and looked Hispanic to me and I think they exercised or kicked off her as well.[2]

"The Court: All right. We'll see you tomorrow morning at 9:45."

The transcript reflects counsel's argument that there was nothing in Elizabeth G.'s background (law enforcement ties) or in her occupation as a customer service representative that would make her sympathetic to the defense; to the contrary, her law enforcement ties would, if anything, make her sympathetic to the prosecution. Counsel added that nothing in Elizabeth G.'s responses or demeanor would justify excusing her. Counsel asserted that the prosecutor's stated race-neutral reasons for excusing Elizabeth G. were not legitimate and that she was excused because she was Hispanic.

Rather than respond directly to these claims, the trial court instead noted that defense counsel had excused a Hispanic juror (Carolyn G.). When counsel argued that the reasons for excusing Carolyn G. were legitimate, the court conclusorily replied that a Hispanic juror with law enforcement ties may still be peremptorily excused by the People, and a Hispanic juror who had been kidnapped had not been excused by the People. Counsel then made it clear that Carolyn G. was excused precisely because she was the victim of a violent crime (kidnapping and attempted rape) at gunpoint, which might make her sympathetic to the prosecution. Unquestionably, this is a legitimate race-neutral reason for excusing a prospective juror. (See, e.g., *People v. Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047], quoting *People v. Wheeler, supra,* 22 Cal.3d at p. 275 (*Wheeler*) [" 'a

---

[2] The prospective juror that the prosecutor was referring to was excused by the defense during the selection of alternate jurors.

defendant may suspect prejudice on the part of one juror because he has been the victim of crime' "].) Yet the court persisted in highlighting Elizabeth G.'s law enforcement ties and stating, without explanation, that the prosecutor might still excuse such a juror.

Counsel again explained that Carolyn G. was excused by the defense for the legitimate race-neutral reason that she was the victim of a kidnapping at gunpoint and might be considered sympathetic to the prosecution. He added that Mary L., the other Hispanic juror, was excused by the prosecution for the legitimate race-neutral reason that she worked with at-risk youth and might be considered sympathetic to the defense. In contrast, stated counsel, there was no legitimate race-neutral reason for excusing Elizabeth G. The court ignored counsel's argument. Then the prosecutor spoke, and instead of justifying his stated reasons for excusing Elizabeth G., he reminded the court that defense counsel had challenged another prospective juror (Mrs. T.) who appeared to be Hispanic. Again, the trial judge did not respond, nor did he affirmatively state that the court's prior ruling would stand. Instead, the judge simply dismissed the parties for the day.

## THE MAJORITY'S ASSERTIONS

From this record, the majority makes two unfounded assertions: (1) the trial court was not required to make a sincere and reasoned attempt to evaluate the prosecutor's explanation and clearly express its findings (*Silva, supra,* 25 Cal.4th at p. 386); and (2) there was no error under *People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452] (*Snow*), where we held "the propriety of the prosecutor's peremptory challenges must be determined without regard to the validity of defendant's own challenges." I dissent.

## UNDERMINING *SILVA*

*Silva* was a unanimous opinion decided just two years ago. We held that the trial court erred in denying a *Wheeler* motion as to a prospective Hispanic juror because "[n]*othing* in the transcript of voir dire *supports* the prosecutor's assertions that [the juror] would be reluctant to return a death verdict or that he was 'an extremely aggressive person.' " (*Silva, supra,* 25 Cal.4th at p. 385, italics added.) We then held that "when the

prosecutor's stated reasons [for excusing a juror] are either *unsupported* by the record, inherently implausible, or both" (*id.* at p. 386, italics added), the trial court must make a sincere and reasoned attempt to evaluate the prosecutor's explanation and clearly express its findings. (*Id.* at pp. 385, 386.) Because "both of the prosecutor's stated reasons [for excusing Juror M.] were factually *unsupported* by the record," we found a *Batson/Wheeler* violation. (*Silva, supra,* 25 Cal.4th at p. 386, italics added.) Notably, the word *contradict* does not appear in the *Silva* opinion.

Yet today, without a sound basis in logic or law, a majority of this court elevates *Silva's* "unsupported by the record" standard to a much stricter "*contradicted* by the record" standard: "Unlike the reasons given by the prosecutor in *Silva,* the prosecutor's reasons given in this case for peremptorily excusing Elizabeth G. were neither inherently implausible, nor *affirmatively contradicted by anything in the record.*" (Maj. opn., *ante,* · at pp. 925–926, italics added.) The majority also states: "Nor have we found anything in the record to *directly contradict* the trial court's express findings to that effect, in contrast to the facts of *Silva.*" (*Id.* at p. 926, italics added.)[3] The majority concludes: "[W]here the prosecutor's reasons for excusing the juror are *neither contradicted* by the record nor inherently implausible (*Silva, supra,* 25 Cal.4th at p. 386), . . . a *Batson/Wheeler* motion [may be] denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (Maj. opn., *ante,* at p. 929, italics added)

The effect of the majority's ruling, as noted by Justice Kennard, is to insulate prosecutors and others who improperly discriminate against jurors for reasons of group bias. (Dis. opn. of Kennard, J., *ante,* at p. 930.) Here, the prosecutor's first purported race-neutral reason for excusing Elizabeth G. was that, as a customer service representative, "she did not have enough educational experience." I agree with the majority's assertion that this reason is of "questionable persuasiveness" (maj. opn., *ante,* at p. 924) and "a dubious notion when viewed in isolation." (*Id.* at p. 925.) However, I disagree that this reason, without further explanation, is "subjective[ly] *genuine*[]" (*id.* at p. 924, italics added) and "legitimate in the sense that it would not deny defendants equal protection of law." (*Id.* at p. 925.) Simply stated, there is nothing in the record to suggest that customer service representatives generally, or this particular juror, lacked educational experience.

The majority, however, reasons that "If a prosecutor can lawfully peremptorily excuse a potential juror based on a hunch or suspicion, or because he does not like the potential juror's hairstyle, or because he observed the potential juror glare at him, or smile at the defendant or defense counsel, then surely he can challenge a potential juror whose *occupation,* in the prosecutor's

---

[3] This last statement is factually incorrect. The trial court made no express findings as to Prospective Juror Elizabeth G.'s education or demeanor.

subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected." (*Id.* at pp. 924–925, italics added.) But the prosecutor did not state he had a hunch, nor did he state that he observed a smile, a glare or poorly groomed hair. Nor did he state that he peremptorily challenged Elizabeth G. because of her occupation; rather, the prosecutor *stated* that "she did not have enough educational experience." *Batson* requires an examination of the prosecutor's stated race-neutral explanation. (*Purkett v. Elem, supra,* 514 U.S. at p. 767.)[4] Here, not only is the prosecutor's stated excuse unsupported by the record, it is lacking in any reasonable foundation in common knowledge or common sense.[5] The subjective genuineness of the prosecutor's stated excuse, therefore, was questionable and demands further inquiry by the trial court.

Moreover, the prosecutor's first unsupported excuse was followed by a second excuse that was further disputed by defendant. Specifically, after the prosecutor stated "[i]t seemed like [Elizabeth G.] was not paying attention to the proceedings and [he] felt that she was not involved in the process," the defense attorney replied, "[t]here was nothing in her responses or demeanor that would justify excusing her other than it being a race-based exclusion." In other words, defense counsel argued to the court that the prosecutor's stated race-neutral reason for excusing Elizabeth G. was unsupported by the record and *contradicted by his own observations*. Yet the trial court did not attempt to resolve this factual dispute by stating its own observations of the juror's alleged inattentiveness. Instead, the trial court completely ignored the defense attorney's observations and argument.

The majority argues that the prosecutor's demeanor-based reason is supported by the record because Elizabeth G. stated during voir dire that "she had no prior jury experience and no past contact with the criminal justice system in any capacity." (Maj. opn., *ante,* at p. 924.) But the prosecutor did not rely upon this statement and, as noted, *Batson* requires that we examine the prosecutor's stated excuse. The prosecutor *stated* that Elizabeth G. "was not paying attention." Obviously, not paying attention is logically unrelated to prior jury service or prior contact with the criminal justice system. More importantly, the prosecutor's assertion that Elizabeth G. "was not paying attention" was *directly contradicted* by the defense. As noted by Justice

---

[4] See also *Hernandez v. New York* (1991) 500 U.S. 352, 358–359 [114 L.Ed.2d 395, 111 S.Ct. 1859] (plur. opn.) ("[I]f the requisite [prima facie] showing has been made [by the defendant], the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.").

[5] The majority attempts to bolster its position by pointing out that an attorney could legitimately "excuse a potential juror because he or she feels the potential juror's occupation reflects *too much education*." (Maj. opn., *ante,* at p. 925, fn. 6.) While common knowledge and common sense might suggest that doctors, mathematicians and engineers, for example, are highly educated and therefore might have "*too much education*" to sit on a particular jury, there is no basis upon which to conclude that customer service representatives do not have enough educational experience to sit on a particular jury.

Kennard, "This contrary assertion created a factual dispute for the trial court to resolve." (Dis. opn. of Kennard, J., *ante*, at p. 932.)

Thus, in the present case, we have one race-neutral reason (education) that is unsupported by the record and belied by common knowledge and common sense, and a second race-neutral reason (demeanor) that was contradicted by defense counsel.[6] Under our recent, unanimous *Silva* holding, the trial court is obligated to make a sincere and reasoned attempt to evaluate the prosecutor's explanations and clearly express its findings.[7]

---

[6] The majority attempts to support its claim that the prosecutor's reasons for challenging Elizabeth G. were not pretextual by pointing out that he accepted "the jury *14 times* with Elizabeth G. seated in the jury box" before challenging her. (Maj. opn., *ante*, at p. 926.) This assertion is misleading because it neglects two factors: (1) because this was a two-defendant case, each side had 30 peremptory challenges in selecting the jury (Code Civ. Proc. § 231, subd. (a)) and the two defense attorneys were alternating their 20 joint challenges; this allowed the prosecutor to wait before exercising his peremptory challenges; and (2) the trial court used the "six pack" method of jury selection, which also allows attorneys to manage their peremptory challenges since they know in advance which six prospective jurors will replace the prospective jurors in the jury box who are challenged. Specifically, the court called the names of 18 prospective jurors: 12 prospective jurors were placed in the jury box (one of whom was Elizabeth G.), and an additional six prospective jurors were seated outside the jury box (the six-pack). The court then posed questions to the 18 prospective jurors and once this process was completed, seven peremptory challenges were exercised, leaving 11 prospective jurors in the jury box and leaving no prospective jurors in the six-pack. At this juncture, seven additional prospective jurors were called by the court; one prospective juror was placed in the jury box, and the remaining six prospective jurors were placed in the six-pack. Once the questioning of these seven prospective jurors was completed (the second round of questioning), the above process was repeated. Jury selection was completed after three rounds of questioning. As noted, Elizabeth G. was one of the original 12 prospective jurors placed in the jury box. The prosecutor challenged one juror (who knew defense counsel) after the first round of questioning and the defense challenged six jurors. Seven new names were called, including Mary L. and Joe S. After the defense had challenged four jurors following the second round of questioning, the prosecutor challenged Joe S., a prospective juror who worked in a law office. The defense then *passed.* The prosecutor then challenged the first Hispanic prospective juror, Mary L. After defense challenged a juror, seven new names were called, including Carolyn G. Carolyn G. was the fourth prospective juror challenged by the defense after the third round of questioning. The prosecutor then excused Elizabeth G. The defense and prosecutor then accepted the jury. Two events stand out: (1) the prosecutor's challenge of the first Hispanic juror (Mary L.) immediately after defense counsel had accepted the jury (voir dire would have otherwise ended); and (2) the prosecutor's challenge of Elizabeth G. *two* rounds subsequent to her name being called (he exercised his three other peremptory challenges in the same round those jurors' names were called). Standing alone, these two events are arguably innocuous; but viewed in the context of the other evidence of the prosecutor's discriminatory intent, his peremptory challenge strategy is consistent with an intent to remove Hispanics from the jury.

[7] See also *People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75] (where prosecutor offered sham and valid reasons for excusing a juror, court is obligated to make a "truly 'reasoned attempt'" to evaluate the prosecutor's explanations" and is required to address the challenged jurors individually).

Because it cannot justify its holding based on the reasons stated by the prosecutor, the majority essentially rewrites *Silva*. Whereas *Silva* held that a trial court's obligation to inquire was triggered by a race-neutral excuse unsupported by the record, the majority today holds that such an obligation is triggered only where such an excuse is contradicted by the record. However, where the unexamined race-neutral excuse belies common sense or is contradicted by defense counsel, we cannot presume that the prosecutor has exercised the peremptory challenge in a constitutional manner. (*People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Under such circumstances, it is all the more important that the trial court "make a 'sincere and reasoned attempt to evaluate the prosecutor's explanation' [citation] and to clearly express its findings [citation]." (*Silva, supra,* 25 Cal.4th at p. 385.)

## SNOW VIOLATION

In *Wheeler,* "[i]nstead of justifying his own conduct, the prosecutor simply retorted that defense counsel seemed in their turn to be striking from the jury . . . most of those with Spanish surnames." (*Wheeler, supra,* 22 Cal.3d at p. 283, fn. 30.) We held that "[a] party does not sustain his burden of justification by attempting to cast a different burden on his opponent." (*Ibid.*) In *Snow, supra,* 44 Cal.3d at page 225, we reiterated this aspect of the *Wheeler* holding and stated: "As the People now concede, the propriety of the prosecutor's peremptory challenges must be determined without regard to the validity of defendant's own challenges."

Here, defense counsel contested the prosecutor's purported race-neutral reasons for challenging Juror Elizabeth G. As noted above, the trial court, in violation of *Silva,* failed to sincerely evaluate the prosecutor's explanation and failed to make particularized findings. (*Silva, supra,* 25 Cal.4th at p. 386.) The trial court compounded its error by committing a *Snow* violation: it attempted to justify the prosecutor's conduct by pointing out that defense counsel had challenged a Hispanic juror. The prosecutor then asked "the record to reflect that defense counsel also had a challenge to [Mrs. T.] [who] seemed and looked Hispanic to me." The trial court did not respond, but excused the parties for the day.

The majority attempts to justify the court's actions by stating: "The court's point was simply this: if defense counsel's threshold premise was true, then the prosecutor, consistent with that premise, had indeed not excused Carolyn G. given her favorable law enforcement contacts, *notwithstanding her Hispanic ancestry.* In context, the point the trial court was obviously trying to make was that the prosecutor *did* seek to retain jurors with law enforcement contacts who would normally be deemed favorable to the prosecution,

including Carolyn G., who was Hispanic. By parity of reasoning, one might expect the prosecutor to have likewise sought to retain Prospective Juror Elizabeth G. who, like Carolyn G., had such favorable law enforcement contacts, notwithstanding *her* Hispanic ancestry, and that Elizabeth G. would have been retained were it not for the other reasons of specific bias which the prosecutor indicated had in fact motivated him to excuse her (her perceived lack of 'educational experience' given her occupation, coupled with her apparent inattentiveness and lack of involvement in the jury selection proceedings)." (Maj. opn., *ante*, at p. 927–928.)

The majority's assertion is unfounded.[8] Defense counsel's point was that there were legitimate race-neutral reasons for challenging Mary L. and Carolyn G., but there was likewise no legitimate race-neutral reason for challenging Elizabeth G. But the trial court completely ignored this argument and stated only that the defense, like the prosecution, had excused a Hispanic juror, which constitutes a violation of *Snow* because the court attempted to justify the prosecutor's peremptory challenge by referencing the validity of the defendant's peremptory challenge. I do not share in the majority's confidence that this is not what occurred because the prosecutor, who was present during this exchange, asked "the record to reflect that defense counsel also had a challenge to [Mrs. T.] [who] seemed and looked Hispanic to me." Clearly, the prosecutor, like the court, attempted to justify the peremptory challenge of Elizabeth G. by casting aspersion on the defense. This is a violation of *Snow*.

---

[8] The majority's premise is also flawed because "there [is] no way to determine whether the prosecutor would have challenged Carolyn G. had the defense not done so first." (Dis. opn., Kennard, J., *ante*, at p. 933.) The majority accuses the dissenting justices of "engag[ing] in speculation" on this point because the "record lends no support to the insinuation that the prosecutor 'might' have challenged" Carolyn G. because "the prosecutor passed and accepted the jury with Carolyn G. seated in the jury box *four times* before the defense elected to peremptorily excuse her." (Maj. opn., *ante*, at pp. 928–929, fn. 9.) This is the sheerest conjecture and is completely undermined by the record. As pointed out by the majority on three occasions, the prosecutor accepted Elizabeth G. "*14 times*" before he peremptorily excused her. (Maj. opn., *ante*, at pp. 909, 926.) It is disingenuous to now claim there is "no support" in the record that the prosecutor would not have excused Carolyn G. where only four opportunities for a peremptory challenge had passed.

## CONCLUSION

The majority today turns a blind eye to our recent precedent and effectively allows prosecutors to improperly discriminate against prospective Hispanic, African-American and other cognizable group jurors with impunity. The majority opinion signals a significant retreat in the evolution of our *Wheeler* jurisprudence and strikes a major blow against a defendant's constitutional right to a fair, impartial, and *representative* jury. Therefore I dissent.

Kennard, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied October 29, 2003.