Filed 8/1/23 P. v. Sandoval CA4/2
Reposting corrected document

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079090 |
| v. | (Super.Ct.No. FVI21002847) |
| JOSE MIGUEL SANDOVAL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Kawika Smith, Judge. Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Jose Miguel Sandoval of one count of felony resisting arrest by force or violence. (Pen. Code, § 69, subd. (a).) On appeal, Sandoval argues that the trial court prejudicially erred by (1) overruling his objections to the prosecution's exercise of two peremptory challenges and (2) not instructing the jury about a law enforcement officer's duty under Penal Code section 841 to inform an arrestee of the reason for the arrest. Sandoval also contends that there is insufficient evidence to support the conviction and that the trial court abused its discretion by not reducing his conviction to a misdemeanor and by not striking a prior strike. We reject the arguments and affirm.

BACKGROUND

In October 2021, Sandoval lived with his girlfriend, Leslie S. One morning, both Sandoval's mother and Leslie called law enforcement. Leslie could not find her keys. Sandoval denied taking them but acted aggressively toward her, not letting Leslie leave the house or go to work. Sandoval told law enforcement officers that he did not have the keys, so nothing happened to him. Sandoval's mother and Leslie left the residence.

Later that day, Leslie called 911 and reported that Sandoval had stolen her truck. The next day, Leslie learned that Sandoval was at his mother's house. Leslie called law enforcement to report Sandoval's location. Sheriff's deputies Kevin Russell and Joseph Mora were dispatched to the location. When the deputies arrived, they saw Sandoval standing near Leslie's truck in the driveway in front of the house. Russell recognized Sandoval from the day before. Russell and Mora confirmed that the truck's license plate number matched that of the truck reported stolen.

Russell testified that the deputies approached Sandoval with the intent to detain him. Mora testified that when the deputies initially contacted Sandoval, it was to arrest him. Mora stated that the deputies had probable cause to arrest Sandoval for possessing a stolen vehicle.

The deputies described Sandoval as being "irate," "upset," "very agitated," "very offensive," and "borderline aggressive." Sandoval's German Shepherd dog was running around outside. Sandoval questioned why Russell and Mora were there. Russell wore a belt with a video camera that recorded the incident. The recording was played for the jury.

Sandoval was holding some random "objects," including a license plate, papers, a plastic container, and two to four hypodermic needles. The deputies were concerned that the needles and the license place could be used as weapons and threatened their safety.

Mora twice told Russell to put his "stuff down." Sandoval did not comply. Sandoval asked if he was being arrested, and Mora answered, "Yes, you're under arrest." Mora next told Sandoval to relax. Sandoval repeatedly said, "no," and Mora repeated that Sandoval needed to relax. Sandoval responded, "You wanna go there. You gonna come, [inaudible] do, I don't know how you guys wanna end this or start this."

Mora testified that he did not tell Sandoval why he was under arrest immediately because of Sandoval's "demeanor," "body language," and "irrational, bizarre behavior." Mora explained that officer safety was the priority under the circumstances.

The deputies repeatedly instructed Sandoval to put down the objects he was holding. Sandoval refused. Mora told Sandoval that he needed to allow the deputies to

handcuff him, and Sandoval refused. Mora told Sandoval that the deputies needed to detain him to ensure the safety of Sandoval and the deputies. The deputies repeatedly told Sandoval that they would talk to him and explain everything after he was detained.

Russell told Sandoval to "turn around" and asked Sandoval if there was anything the deputies could do "to make [Sandoval] put [his] hands behind [his] back" to allow the deputies to detain him. Sandoval did not comply. Sandoval looked over his shoulder while stepping backward. Mora thought Sandoval was preparing to flee.

Russell approached Sandoval and attempted to grab Sandoval's arm. Sandoval screamed for Russell to get off his foot. Sandoval pulled away from Russell. Russell slapped the items that out of Sandoval's hand, causing the items to fall to the ground. Russell reached out with both of his hands in an attempt to secure Sandoval's right arm. Before Russell could grab Sandoval's arm, Sandoval attempted to elbow Russell in the face. Russell ducked out of the way and grabbed Sandoval's torso. Both men fell to the ground. Russell wanted Sandoval on the ground because Russell believed that it would be easier to gain control of Sandoval on the ground.

Russell was on top of Sandoval, who was on his back. Russell tried to secure Sandoval's hands, but Sandoval flailed his hands and attempted to strike Russell. Sandoval twice struck Russell in the face or chest with his fist. Russell repeatedly told Sandoval to stop resisting, but Sandoval did not comply. Russell struck Sandoval twice on the face with an open hand. Russell pushed Sandoval onto his stomach and straddled Sandoval's back. Russell attempted to grab Sandoval's hands, but Sandoval put his

4

hands underneath his chest and stomach. Russell did not know whether Sandoval had any weapons.

Mora then told Russell to move and sprayed Sandoval's forehead with pepper spray. Mora wanted to prevent Russell from being injured further. Russell had abrasions on his hands and elbows and was bleeding. Sandoval did not comply after being pepper sprayed. Russell ordered Sandoval to put his hands behind his back, but Sandoval refused. Sandoval's mother approached and repeatedly told Sandoval to listen, as the deputies repeatedly told Sandoval to put his hands behind his back and to stop resisting.

Mora warned Sandoval: "Put your hands behind your back or you're gonna get tased." Sandoval's mother again told him to listen. Sandoval stopped resisting.

Throughout the physical confrontation between Sandoval and Russell, Sandoval kept calling Russell "Bitch." Sandoval also repeatedly called out his dog's name.

Sandoval testified that he did not know why the deputies were arresting him. He was confused about why the deputies were at the house. Sandoval denied swinging his elbow at Russell and denied swinging at or trying to strike Russell. When Sandoval was on the ground with Russell on top of him, Sandoval flailed his arms back and forth to block Russell from hitting him in the head and the back.

Sandoval acknowledged that he knew he was being detained and did not comply with the deputies' orders. Sandoval had planned to comply with the deputy's orders so long as Russell complied with Sandoval's demands. Sandoval did not believe the needles could be used as weapons.

5

DISCUSSION

A. *Jury Selection*

Sandoval argues that reversal is required because the prosecutor's use of peremptory strikes excusing one Hispanic juror and one African American juror during jury selection violated *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), and Code of Civil Procedure section 231.7 (unlabeled statutory references are to this code) because the prosecutor excused the jurors based on their race. We are not persuaded.

1. *Governing Law*

"The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801; *Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) Section 231.7 now codifies that principle and provides that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a) (§ 231.7(a)).) The statute provides that "[a] motion brought under this section shall also be deemed a sufficient presentation of claims asserting the

6

discriminatory exclusion of jurors in violation of the United States and California Constitutions." (§ 231.7, subd. (d)(1).)

For criminal jury trials after January 1, 2022, section 231.7 sets forth the procedure that a trial court must follow when a party objects to the improper use of a peremptory challenge under section 231.7(a). (§ 231.7, subds. (c), (d), (i), (k).) When an objection to the use of a peremptory challenge as violating section 231.7(a) has been made, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised." (*Id.*, subd. (c).) The trial "court shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances. The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge. If the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained." (§ 231.7, subd. (d)(1).) Subdivision (d)(3) of section 231.7 provides a nonexhaustive list of circumstances the court may consider. (*Id.*, subd. (d)(3)(A)-(G).) "For purposes of this section, an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (*Id.*, subd. (d)(2)(A).) "[A] 'substantial likelihood' means more than a mere possibility but less than a standard of more likely than not" (*id.*, subd. (d)(2)(B)), and "'unconscious bias' includes implicit and institutional

7

biases" (*id.*, subd. (d)(2)(C)). "The court shall explain the reasons for its ruling on the record." (§ 231.7, subd. (d)(1).)

Subdivision (g)(1) of section 231.7 (section 231.7(g)(1)) describes three "reasons for peremptory challenges" that "have historically been associated with improper discrimination in jury selection": "The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor," "[t]he prospective juror was inattentive, or starting or failing to make eye contact," and "[t]he prospective juror provided unintelligent or confused answers." (*Id.*, subd. (g)(1)(A)-(C).) Those three reasons "are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7, subd. (g)(2) (§ 231.7(g)(2)).)

We review de novo the overruling of an objection made under section 231.7, "with the trial court's express factual findings reviewed for substantial evidence." (§ 231.7, subd. (j).) We do "not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record." (*Ibid.*) We consider only those reasons actually given by the trial court and do "not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of

8

whether the moving party made a comparative analysis argument in the trial court." (*Ibid.*) If we conclude that the trial court erred by overruling an objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

2. *Prospective Juror No. 11*

Prospective Juror No. 11 was an African American woman. She answered questions from the prosecutor and defense counsel. The prosecutor used a peremptory challenge to excuse Prospective Juror No. 11, which defense counsel objected to under section 231.7.

The prosecutor stated that she was excusing Prospective Juror No. 11 for the "neutral" reason of Prospective Juror No. 11's "body language." The prosecutor explained: When the conversation was "getting political," the prosecutor noticed that Prospective Juror No. 11 "made body movements towards the other jurors." For example, when one of the other jurors was expressing his opinion about what had happened with George Floyd, Prospective Juror No. 11 "leaned forward, turned her head and looked at him and gave him this, essentially dirty look." The prosecutor also noticed that when other jurors were talking, Prospective Juror No. 11 would look at the other jurors and "make[] faces pertaining to their comments. Her arms were crossed tight and held close to her body." In addition, the prosecutor said that she noticed that Prospective Juror No. 11 had been commenting "under her breath" when other jurors were expressing their opinions.

The prosecutor was concerned that Prospective Juror No. 11 would be unable "to actively deliberate with the jury if it were to get to the point, when it gets to deliberation, I'm concerned if her opinion differs, that she might make people feel uncomfortable given the fact that she was giving people looks at certain answers and she was saying her own comments under her breath while other people were talking. So I do have concerns that [Prospective Juror No. 11] would not be able to cooperate with the rest of the jurors."

Defense counsel pointed out that the prosecution's stated reasons were among those listed in section 231.7(g)(1) as being "associated with improper discrimination." Defense counsel argued that although the prosecutor stated that her reasons were neutral, "the discussion was obviously not devoid of elements that implicate race in America" because it involved the killing of George Floyd and the subsequent protests. Defense counsel explained that given the topic, Prospective Juror No. 11's reaction to other juror's comments was "connected to race." For example, one of the other jurors said that the protests occurred because George Floyd had been "accidentally killed" and that seemed to "hit a nerve" for Prospective Juror No. 11. Defense counsel also noted that he had not seen Prospective Juror No. 11 comment under her breath.

The court found that there did not appear to be "an apparent pattern in the peremptories that [the prosecutor was] exercising that would indicate an explicit or implicit bias" because the prosecution had exercised peremptory challenges to excuse one Hispanic man, one white woman, and one African American man. The court further found that the prosecutor's stated reasons were "presumptively invalid" because they were the types of behavior that "have historically been associated with improper

10

discrimination," as indicated in section 231.7, subdivision (g)(1)(B). The court also found that it had observed the behaviors indicated by the prosecutor.

The court overruled defense counsel's objection to the prosecutor's peremptory challenge to Prospective Juror No. 11, reasoning: The prosecutor "has given a neutral justification for her exercise of that peremptory, so the Court will find that there's a substantial likelihood that an objectively reasonable person would view or would not view race or gender or any of the cognizable factors to be a factor in this case. [¶] It is highly probable that the reasons for the challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on the jury's ability to be fair and impartial in this case."

Sandoval argues that the trial court erred by overruling defense counsel's objection to this peremptory challenge, because nothing in the prosecutor's explanation of how Prospective Juror No. 11's behavior or demeanor mattered to the case addressed "'the manner in which the prospective juror answered questions,'" which Sandoval contends section 231.7(g)(2) requires. We reject the argument because under the circumstances section 231.7(g)(2) does not contain any such requirement.

Section 231.7(g)(2) requires the party exercising a peremptory challenge for a presumptively invalid reason listed in section 231.7(g)(1) to "explain why the asserted demeanor, behavior, *or* manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7(g)(2), italics added.) Section 231.7(g)(2)'s list is disjunctive. A party exercising a peremptory challenge based on a presumptively invalid reason listed in section 231.7(g)(1) must explain why either "the asserted

11

demeanor" *or* "the asserted . . . behavior" *or* "the asserted . . . manner in which the prospective juror answered questions" "matter[ed] to the case to be tried." (§ 231.7(g)(2).)  The explanation required under section 231.7(g)(2) is dependent on which of section 231.7(g)(1)'s listed reasons was given for exercising the peremptory.

The prosecutor sought to excuse Prospective Juror No. 11 on the basis of the juror's body language (as listed in § 231.7, subd. (g)(1)(B)), so the prosecutor had to explain only why the asserted "demeanor" or "behavior"—that is, Prospective Juror No. 11's body language—"matter[ed] to the case to be tried."  (§ 231.7(g)(2).)  Because the prosecutor did not seek to excuse Prospective Juror No. 11 on the basis of the way she answered any questions (as listed in § 231.7, subd. (g)(1)(C)), the prosecutor was not required under section 231.7(g)(2) to explain why the manner in which Prospective Juror No. 11 answered questions mattered.

Sandoval also argues that the prosecutor's "alleged reasons were not sincere and were pretextual" because "the prosecutor never questioned [Prospective Juror No. 11] in regard to the claimed problematic demeanor."  The argument lacks merit.  Section 231.7 does not contain any such requirement.  Section 231.7(g)(2) establishes the procedures that the trial court must employ when a peremptory challenge has been exercised for a presumptively invalid reason listed in section 231.7(g)(1).  Section 231.7(g)(2) does not require counsel exercising the peremptory to demonstrate that counsel had questioned the prospective juror about the asserted problematic behavior.

Sandoval also argues that the prosecutor's explanation that Prospective Juror No. 11 would make other jurors "'uncomfortable'" "is not a valid reason for dismissing a

12

juror." This argument too lacks merit. The trial court found under section 231.7, subdivision (d)(1), that there was not a substantial likelihood that an objectively reasonable person would view Prospective Juror No. 11's race or gender as the reason the prosecutor exercised the peremptory challenge. We independently review that determination. (§ 231.7, subd. (j).) Because the prosecutor's reasons were based entirely on the prospective juror's nonverbal behavior and demeanor, we defer to the trial court's finding confirming that Prospective Juror No. 11 engaged in the witnessed behavior. (*People v. Reynoso* (2003) 31 Cal.4th 903, 926 (*Reynoso*).) Given those findings about Prospective Juror No. 11's conduct—that the prospective juror was making faces at other jurors, giving dirty looks to other jurors, crossing her arms tightly, and commenting under her breath when other jurors were answering questions—we independently agree with the trial court that there was not a substantial likelihood (that is, "more than a mere possibility but less than a standard of more likely than not" (§ 231.7, subd. (d)(2)(B)) the prosecutor exercised the peremptory challenge to excuse Prospective Juror No. 11 because of her race.

Sandoval also contends that nothing about Prospective Juror No. 11's "demeanor showed an inability to cooperate with other jurors," because Prospective Juror No. 11's body language merely demonstrated "a disagreement with the comments of other prospective jurors." The record reveals nothing about Prospective Juror No. 11's nonverbal demeanor. We defer to the trial court's finding that Prospective Juror No. 11 had engaged in the behaviors witnessed by the prosecutor, which included that Prospective Juror No. 11 was making "body movements towards the other jurors" and

giving other jurors "dirty look[s]."  (*Reynoso, supra*, 31 Cal.4th at p. 926.)  The described

hostile demeanor reasonably supports the prosecutor's concern that Prospective Juror No.

11 may have been disruptive in deliberations when and if she disagreed with other jurors.

For these reasons, we conclude that the trial court did not err by overruling

Sandoval's objection to the prosecution's use of a peremptory challenge to excuse

Prospective Juror No. 11.

3.  *Prospective Juror No. 28*

The prosecutor exercised another peremptory challenge to excuse Prospective

Juror No. 28, whom the prosecutor identified as an Hispanic or African American

woman.  The prosecutor had previously unsuccessfully attempted to excuse Prospective

Juror No. 28 for cause.  Defense counsel objected to the peremptory challenge.

The prosecutor stated that she was excusing Prospective Juror No. 28 because of

the juror's body language, inattentiveness, and reluctance to answer questions.  The

prosecutor explained that she believed Prospective Juror No. 28 had been inattentive

during jury selection because Prospective Juror No. 28 crossed her arms and looked

down, which also was the body language that concerned the prosecutor.

Defense counsel countered that he believed that Prospective Juror No. 28 had

engaged in a "rather thoughtful discussion."  Defense counsel also did not believe that

Prospective Juror No. 28 had been inattentive or that Prospective Juror No. 28 looked

away or crossed her arms "to the extent that she wasn't engaged."  Defense counsel

believed that Prospective Juror No. 28 looked down because an "uncomfortable subject"

14

was being discussed. Defense counsel pointed out that section 231.7(g)(2) required the prosecutor to explain why Prospective Juror No. 28's behaviors mattered to the case.

The court asked the prosecutor to address the issue and to describe how Prospective Juror No. 28's behaviors mattered to the case. The prosecutor explained that Prospective Juror No. 28's inattentiveness, reluctance to speak, and body language would impact "her serving as a juror given the fact that she may have disinterest in this case, given the fact that she's looking away, not making eye contact, looking down, having her arms crossed. She wasn't actively engaging in the voir dire, so I do have concerns as to whether she would be able to listen to the testimony and whether she would be able to deliberate with the other jurors when it gets to that time."

Defense counsel countered that Prospective Juror No. 28 "was engaged in voir dire, plainly." Counsel believed the issue was "the extent to that which she was engaged in her responses, which I believe are connected to her membership in her protected class."

The court found "that the behaviors exhibited by [Prospective Juror No. 28], the Court did observe those as well as indicated by" the prosecutor. The court also found "by clear and convincing evidence there's not an—it's highly probable that the reason given for the challenge is unrelated to conscious or unconscious bias and are instead, bear on the juror's ability to be fair and impartial in the case. I don't think that the motivations for the exercise of that peremptory were based on bias for or against any cognizable group, so that challenge, when it is exercised, is overruled."

15

Sandoval argues that the prosecutor's reasons for excusing Prospective Juror No. 28 "were pretextual" and "do not withstand scrutiny." Sandoval first argues that none of Prospective Juror No. 28's "answers showed an inability to serve as an impartial juror" and that Prospective Juror No. 28's "demeanor in no way negatively impacted how the prospective juror's answers to the questions 'matter[ed] to the case to be tried.'" We reject the arguments for the same reason we rejected the argument made as to Prospective Juror No. 11. The prosecutor did not excuse Prospective Juror No. 28 for the presumptively invalid reason that she provided "unintelligent or confused answers" (§ 231.7, subd. (g)(1)(C)), so the prosecutor was not required to rebut that invalidity under section 231.7(g)(2) by explaining why the manner in which Prospective Juror No. 28 answered questions mattered to the case.

Sandoval also argues that the record does not support the prosecutor's claim that Prospective Juror No. 28 was not actively engaged during voir dire. He contends that the record demonstrates that Prospective Juror No. 28 "thoughtfully answered" all of the questions asked of her, which he contends shows that she "was attentive." The argument lacks merit. First, the trial court confirmed that Prospective Juror No. 28 had been inattentive during voir dire. We defer to that finding because we cannot confirm the prospective juror's level of attentiveness. (*Reynoso*, *supra*, 31 Cal.4th at p. 926.) Second, the fact that Prospective Juror No. 28 answered the questions put to her does not undermine the trial court's finding, because it does not demonstrate that she was otherwise attentive throughout voir dire.

16

For the foregoing reasons, we conclude that the trial court did not err by overruling Sandoval's objection to the prosecutor's use of a peremptory challenge to excuse Prospective Juror No. 28.

B. *Penal Code section 841*

Sandoval makes two arguments concerning Penal Code section 841. First, he argues that the deputies violated Penal Code section 841 by not telling Sandoval why he was being arrested. He argues that the record therefore does not contain sufficient evidence that the deputies were performing their lawful duty when Sandoval resisted, as required to support a conviction under Penal Code section 69. Second, Sandoval argues that the trial court committed prejudicial error by not instructing the jury sua sponte about the legal requirements of Penal Code section 841. We reject both arguments.

1. *Sufficiency of the Evidence*

"In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt. [Citation.] We draw all reasonable inferences in favor of the judgment." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.)

Penal Code section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable" by fine, imprisonment, or incarceration. (Pen. Code, § 69, subd. (a).) The court instructed the

17

jury that to convict Sandoval of violating Penal Code section 69 the prosecution had to prove beyond a reasonable doubt that: (1) "The defendant unlawfully used force or violence to resist an executive officer;" (2) "[w]hen the defendant acted, the officer was performing his lawful duty;" (3) "[w]hen the defendant acted, the defendant knew that the person he resisted was an executive officer;" and (4) "[w]hen the defendant acted, he knew the executive officer was performing his duty." (CALCRIM No. 2652.) The jury was further instructed that "[a] *peace officer* is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties." (CALCRIM No. 2652.) Another instruction explained when an arrest or detention is unlawful and when force is unreasonable or excessive. (CALCRIM Nos. 2652, 2670.)

Penal Code section 841 provides: "The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the authority to make it, except when the person making the arrest has reasonable cause to believe that the person to be arrested is actually engaged in the commission of or an attempt to commit an offense, or the person to be arrested is pursued immediately after its commission, or after an escape. [¶] The person making the arrest must, on request of the person he is arresting, inform the latter of the offense for which he is being arrested."

When Mora told Sandoval that Sandoval was under arrest, the deputies had reasonable cause to believe that Mora was actually engaged in committing the offense of possessing a stolen vehicle in violation of Penal Code section 496d. Leslie had reported that Sandoval stole her truck and that Sandoval was at his mother's house. When the

18

deputies arrived at that house, they saw Sandoval and the truck in the driveway. Russell recognized Sandoval from the day before, and the deputies verified that the truck was the one Leslie had reported stolen. Because the evidence established that the deputies had reason to believe that Sandoval was actively committing a crime, the deputies' failure to inform Sandoval why he was being arrested was excused. (Pen. Code, § 841; *People v. Hammond* (1960) 54 Cal.2d 846, 854 [compliance with Pen. Code § 841 "was not required as the defendant was then engaged in the commission of an offense, i.e., the unlawful possession of a narcotic"].) We accordingly conclude that the record contains substantial evidence that Russell and Mora were lawfully performing their duty when Sandoval resisted, so the evidence was sufficient to support Sandoval's conviction.

2. *Jury Instruction*

Sandoval argues that the trial court prejudicially erred by failing to instruct the jury sua sponte on the requirements of Penal Code section 841. We disagree. Sandoval is correct that a trial court has a sua sponte "duty to instruct as to defenses '"that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case."'" (*People v. San Nicholas* (2004) 34 Cal.4th 614, 669; *People v Saille* (1991) 54 Cal.3d 1103, 1117 (*Saille*).) The People counter that an instruction on Penal Code section 841 would have been a pinpoint instruction, so the court had no duty to give it sua sponte. (*Saille*, *supra*, at p. 1117.) We agree with the People.

Pinpoint "'instructions relate particular facts to a legal issue in the case'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824) and are appropriate "when a defendant presents

19

evidence to attempt to negate or rebut the prosecution's proof of an element of the offense" (*Saille*, *supra*, 54 Cal.3d at p. 1117).  Such instructions "'are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.'"  (*Gutierrez*, *supra*, at p. 824.)  Here, an instruction on Penal Code section 841 would have related the facts of the deputies' failure to tell Sandoval why he was being arrested to the element requiring the officers to be performing their lawful duty.  It thus would have been a pinpoint instruction, so Sandoval's argument that the trial court was required to give the instruction sua sponte lacks merit.

In any event, the record does not contain substantial evidence to warrant giving an instruction on Penal Code section 841.  There was no substantial evidence that Russell and Mora violated Penal Code section 841 and thus were not performing their lawful duty.  There was no evidence that Russell and Mora did not have reasonable cause to believe that Sandoval was actively engaged in the crime of possessing a stolen vehicle when they approached Sandoval to arrest him.  (Pen. Code, § 841.)  As we have already explained, there accordingly was no evidence that the deputies had to inform Sandoval why he was being arrested.  Given the lack of evidence that Penal Code section 841 obligated the deputies to tell Sandoval why he was being arrested, we conclude that the trial court did not err by failing to instruct the jury about Penal Code section 841.

C. *Sentencing Issues*

Sandoval argues that the trial court abused its discretion by (1) denying his motion to reduce his felony conviction to a misdemeanor under Penal Code section 17,

20

subdivision (b), and (2) denying his motion to strike a prior strike conviction under Penal Code section 1385, subdivision (a), and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).  The arguments lack merit.

    1.  *Sentencing Hearing*

After the parties rested, the court found true beyond a reasonable doubt the following aggravating circumstances:  (1) Sandoval had suffered numerous prior convictions, (2) Sandoval served a prior prison term, (3) Sandoval was on parole when he committed the offense, and (4) Sandoval's performance while on parole was unsatisfactory.  Sandoval's criminal history included the following felony convictions for which Sandoval was sentenced to prison:  (1) In 2016, he was convicted of assault with a deadly weapon other than a firearm (Pen. Code, § 245, subd. (a)(1)) and of stealing a vehicle (Veh. Code, § 10851); (2) in 2019, he was convicted of attempted false imprisonment (Pen. Code, §§ 664, 236); and (3) in 2021, he was convicted of attempted vandalism (Pen. Code, §§ 664, 594, subd. (b)(1)).  The court found that the prosecution had not proved beyond a reasonable doubt the allegation that Sandoval "engaged in violent conduct that indicates a serious danger to society."  The court noted that Sandoval's behavior in committing the charged offense was violent, but the court did not believe the violence rose to the level of being a serious danger to society.

Sandoval moved to reduce the felony to a misdemeanor under Penal Code section 17, subdivision (b), and to strike the prior strike conviction under Penal Code section 1385, subdivision (a), and *Romero*, *supra*, 13 Cal.4th 497.  Sandoval argued that the motions should be granted because he was only 25 years old when he committed the prior

21

strike offense and his "subsequent offenses have been decreasing in severity." He also argued that (1) he experienced childhood trauma from exposure to domestic violence between his parents and his father's alcohol abuse; (2) Sandoval suffered from mental health issues, as documented in his jailhouse medical records; (3) he suffered from substance abuse issues; (4) he did not initiate the contact with law enforcement; and (5) commission of the charged offense was related to his mental health issues. A biopsychosocial assessment of Sandoval prepared for defense counsel by a social worker and Sandoval's jailhouse medical records were attached as exhibits to the motion. The People opposed the motions.

At sentencing, the court indicated that it had read and considered the probation officer's report and the parties' sentencing briefs. After hearing argument, the court denied both of Sandoval's motions, reasoning that "because of the aggravating factors that were found in this case that it would not be appropriate to strike the strike or to reduce this to a misdemeanor." The court indicated that it "believe[d] that there have been mitigating factors as well contained in the sentencing memorandum submitted by the defense." The court acknowledged that Sandoval's convictions were of decreasing severity, but the court also "recognize[d] that there was a deputy that was injured during the incident." In addition, the court noted that although Sandoval did not initiate the contact with the deputies, "Sandoval was not submitting to law enforcement orders" and "had his own fate in his own hands and may have submitted to the directions of" the deputy.

The trial court sentenced Sandoval to the middle term of two years, doubled to four years because of the strike. The court found the low-term inappropriate because Sandoval had received low-term sentences for his prior convictions.

2. *Reduction to a Misdemeanor*

When an offense is "punishable either by a term in state prison or by imprisonment in county jail and/or by a fine," such offenses—"commonly referred to as 'wobbler[s]'"—are "in the discretion of the court, punishable as either a felony *or* a misdemeanor." (*People v. Park* (2013) 56 Cal.4th 782, 789; Pen. Code, § 17, subd. (b).) Penal Code section 69 is punishable as a felony or a misdemeanor. (Pen. Code, §§ 69, subd. (a), 1170, subd. (h).) The factors relevant to the court's determination include "'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or [the defendant's] traits of character as evidenced by [the defendant's] behavior and demeanor at the trial.'" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 978 (*Alvarez*).) The court also may consider the defendant's criminal history (*id.* at p. 979) and the general objectives of sentencing outlined in rule 4.410 of the California Rules of Court (*Alvarez, supra*, at p. 978), such as "[p]rotecting society," "[p]unishing the defendant," and "[e]ncouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses" (Cal. Rules of Court, rule 4.410(a)(1)-(3)). No single factor controls. (*Alvarez*, at p. 979.)

We review the trial court's decision for abuse of discretion. (*Alvarez, supra*, 14 Cal.4th at p. 977.) The defendant carries the burden on appeal "'to clearly show that the sentencing decision was irrational or arbitrary.'" (*Ibid.*) Absent "'such a showing, the

trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" (*Id.* at pp. 977-978.) We will not reverse the trial court's decision "'merely because reasonable people might disagree.'" (*Id.* at p. 978.) An appellate court ""'" is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'"" (*Ibid.*)

We cannot say that the trial court's decision was clearly irrational or arbitrary. (*Alvarez*, *supra*, 14 Cal.4th at p. 977.) In denying Sandoval's motion to reduce the offense to a misdemeanor, the trial court considered Sandoval's criminal history, including multiple prior convictions and prison terms. The court recognized that Sandoval's convictions were of decreasing severity. The court also considered a felony conviction justified by the fact that when Sandoval committed the offense, he was on parole, which demonstrated that he did not perform satisfactorily on parole. Moreover, the court found that Sandoval had caused one of the deputies to be injured and that the incident could have been avoided had Sandoval complied with the deputies' directions. The court nevertheless acknowledged that there were mitigating circumstances in the case, such as Sandoval's mental health and substance abuse issues and his experience of childhood trauma. The record thus reflects that the trial court gave due consideration to the appropriate facts and circumstances. We see no basis to conclude that the court's ultimate decision was irrational or arbitrary.

Sandoval's arguments to the contrary are unavailing. He contends that the trial court abused its discretion because the following mitigating circumstances support

reducing the felony to a misdemeanor: (1) Sandoval "had done nothing wrong before he was accosted by the two officers, who refused to tell him why he was being detained," (2) Sandoval's prior convictions were not for increasingly serious crimes, (3) Sandoval "'grew up in a toxic environment'" and is mentally unstable, and (4) the deputy's injuries were minor. Sandoval also contends that punishment would be served by sentencing him to incarceration in county jail. Sandoval rightly does not argue that the trial court erred by failing to consider those factors. The trial court explicitly acknowledged that mitigating circumstances were present, and the court rejected Sandoval claim that he had done nothing wrong.

Sandoval's list of mitigating factors does not demonstrate that the trial court's decision was an abuse of discretion but rather demonstrates that reasonable people might disagree on the outcome. We cannot reverse the trial court's decision on that basis, nor can we substitute our judgment for the judgment of the trial court. (*Alvarez*, *supra*, 14 Cal.4th at p. 978.) It was not clearly irrational or arbitrary for the trial court to conclude that the mitigating factors were outweighed by the nature and circumstances of the offense (including the injury Sandoval caused), Sandoval's criminal history, and the fact that he was on parole when he committed the charged offense. (*Id.* at p. 977.) We accordingly conclude that the trial court did not abuse its discretion by denying the motion to reduce the felony to a misdemeanor.

3. *Prior Strike*

A trial court may, "in furtherance of justice," strike a prior conviction under the Three Strikes law. (Pen. Code, § 1385, subd. (a); *Romero*, *supra*, 13 Cal.4th at pp. 529-

25

530.) In considering whether to strike a prior strike conviction, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) Only "extraordinary" circumstances warrant finding that a defendant who is a career criminal "falls outside the spirit of the three strikes scheme." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*); *People v. Philpot* (2004) 122 Cal.App.4th 893, 907.)

We review the trial court's decision for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 375.) It is the defendant's burden on appeal to ""show that the sentencing decision was irrational or arbitrary."" (*Id.* at p. 376.) Absent ""such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."" (*Id.* at pp. 376-377.) In addition, we will not reverse a trial court's sentencing decision ""merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"" (*Id.* at p. 377.) "Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*) Put another way, when the relevant factors

"manifestly support the striking of a prior conviction and no reasonable minds could differ—the failure to strike would constitute an abuse of discretion." (*Id.* at p. 378.)

For the same reasons that we found no abuse of discretion in the trial court's decision not to reduce the felony to a misdemeanor, we cannot say that the trial court's decision not to strike the prior strike conviction was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.) The trial court denied the *Romero* motion for the same reasons that it denied the motion to reduce the conviction to a misdemeanor. The court considered the nature of the offense—that it involved violence, resulted in an injury to a law enforcement officer, could have been avoided, and occurred while Sandoval was on parole—as well as Sandoval's criminal history and relevant particulars of Sandoval's background and character. We cannot say that the court's ultimate balancing of all of those considerations amounted to an abuse of discretion.

Sandoval's arguments to the contrary are unavailing. He again contends that the trial court abused its discretion because the same mitigating circumstances support striking the prior strike. He does not argue that the trial court failed to consider those factors. Sandoval in effect asks that we reweigh the factors the trial court considered in denying the motion. In determining whether the trial court abused its discretion, we may not substitute our judgment for that of the trial court. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) And the trial court does not abuse its discretion merely because reasonable people might disagree about the outcome. (*Ibid.*) Sandoval has not carried his burden of

demonstrating that the trial court abused its discretion by not striking the prior strike. (*Id.* at p. 376-377.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
                                                            J.


We concur:

CODRINGTON
                Acting P. J.
RAPHAEL
                J.